985 A.2d 1160

The MARYLAND–NATIONAL CAPITAL PARK
AND PLANNING COMMISSION, et al.

v.

GREATER BADEN–AQUASCO CITIZENS
ASSOCIATION, et al.

No. 19 Sept.Term 2009.

Court of Appeals of Maryland.

Dec. 23, 2009.

74

M. Andree Green (Adrian R. Gardner, Gen. Counsel, and George R.H. Johnson, of The Maryland–National Capital Park & Planning Commission of Upper Marlboro), on brief, for petitioners.

G. Macy Nelson (Paul N. DeSantis of Towson), on brief, for respondents.

Argued before BELL, C.J. HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

This case considers the legal nexus, if any, between the subdivision of land and land use planning, as represented in adopted and approved "comprehensive plans," in Prince George's County. Donald Cox (the apparent[1] "Developer") applied to the Prince George's County Planning Board of the Maryland–National Capital Park and Planning Commission

---

1. Section 24–115 of the Subdivision Regulations of Prince George's County, Maryland, provides that the subdivider or his agent may file an application for a proposed subdivision. The record indicates that the Wilkerson Inheritance Partnership was the record owner of the subject property at the time the application was filed. The application for preliminary subdivision approval lists Cox as the applicant and owner. Although it is not entirely clear from the record what Cox's legal or contractual connection may be to the subject property (at one point in the transcript of the hearing before the Planning Board, the Property is referred to as Cox's property), we assume that he was authorized to file and prosecute the application.

(the "Planning Board" or the "Commission") for approval of a preliminary subdivision plan (the "Preliminary Plan"). The Planning Board approved the Preliminary Plan over the protest of a neighbor who testified, in individual and representative capacities, at the public hearing. Judicial review of that action was sought in the Circuit Court for Prince George's County. The Circuit Court remanded the case to the Planning Board for further consideration of certain matters referred to in land use planning documents addressed to that part of Prince George's County ("the County") where the subject property is located. The Planning Board and the Developer filed a timely appeal to the Court of Special Appeals, complaining about the remand because consideration by the Planning Board of the pertinent land use planning issue (in this case, a numeric residential growth objective) was not required. The Court of Special Appeals affirmed the judgment of the Circuit Court. We shall affirm the Court of Special Appeals, but for reasons somewhat less expansive than articulated in the opinion of our appellate colleagues.

## I. FACTS AND PROCEDURAL BACKGROUND

On 30 December 2005, the Developer applied to the Commission for approval of a preliminary subdivision plan proposing 20 single-family detached residential lots on 118.30 acres located east of Md. Rte. 301 in southern Prince George's County. The subject property is referred to at times in the record as the Schultze Property.[2] It sits astride the east and west sides of Aquasco Road (MD 381) and borders the Charles County line. Aquasco Road is designated by the County as a historic road. Md.-Nat'l Capital Park and Planning Comm'n, *Prince George's County Historic Sites and District Plan* H–5 (1992).[3] The subject property is located in a portion of the

---

**2.** The record also refers to it as the "Shultz Property" and "Schultz Property." The record indicates that the Wilkerson Inheritance Partnership's grantor was Edward W. Schultze.

**3.** The Historic Sites and District Plan defines a historic road as one that is "documented by historic surveys or maps, maintains its original

County designated as the Rural Tier, as defined by the 2002 Approved Countywide General Plan [4],[5] (the "General Plan").

The Planning Board held a public hearing on 18 May 2006 to consider the Preliminary Plan application. The Board heard testimony initially from two members of the Commission's Subdivision Section Technical Staff, Ivy Thompson and Alan Hirsch, who recommended approval of the Preliminary Plan. Joanne Flynn of the Greater Baden–Aquasco Citizen's Association testified in opposition to approval of the Preliminary Plan. Flynn testified, among other things, with regard to the General Plan's restrictive numeric residential growth objective [6] as it relates to the "excessive" current residential growth experienced in the Rural Tier and its relation to the

alignment and landscape context through views of natural features, historic landscape patterns, historic sites and structures, farmstead groupings or rural villages." *Prince George's County Historic Sites and District Plan*, at M–2.

4. The General Plan divides the County for planning purposes into three "tiers": the Developed Tier, the Developing Tier, and the Rural Tier. Md.-Nat'l Capital Park and Planning Comm'n, 2002 Approved General Plan 4–5 (2002).

5. Article 28, § 7–108(a)(1)(i) of the Maryland Code, (1957, 2003 Repl. Vol & Supp.2009) provides that, at the direction of the Prince George's County Council, sitting as the District Council for zoning and planning in the County,

 the Commission shall initiate and adopt a general plan for the development of that portion of the Maryland–Washington Regional District located in each county and, from time to time, shall initiate and adopt amendments thereto.

 (2) The general plan and amendments shall contain the Commission's recommendations for such development, together with such descriptive or supporting material as the appropriate district council may direct, or the Commission shall determine to be necessary and feasible.

 The District Council's authority to adopt a General Plan and the elements of a General Plan are discussed more fully *infra*.

6. "The growth objective of the [General Plan] is that 33 percent of the county's residential growth over the next 25 years is to be located in the Developed Tier, 66 percent in the Developing Tier, and one percent in the Rural Tier." Md.-Nat'l Capital Park and Planning Comm'n, *Prince George's County Approved General Plan* 4 (2002).

Preliminary Plan, which she maintained, justified disapproval of the application.[7]

The Planning Board approved the Preliminary Plan by a Resolution, dated 15 June 2006 (the "Resolution"), subject to fourteen conditions not relevant here. Pertinent, however, to the dispute in the present case, the Resolution included the following findings (distinguished perhaps more by what it does not address—the numeric growth objective—than for what it does):

> **Community Planning**—This site is located in the Rural Tier. The vision for the Rural Tier is the protection of large amounts of land for woodland wildlife habitat, recreation and agriculture pursuits, and preservation of rural character and vistas that now exist. This application is not inconsistent with the 2002 General Plan Development Pattern policies for the Rural Tier. Based on the proposed development, as modified by conditions contained in this report, the subject application conforms to the low rural residential land use recommended in the 1993 Subregion VI Study Area Master Plan.
>
> Several elements of the plan, as approved with conditions and as noted in various review referrals, demonstrate conformance to the maps and text of the master plan and general plan. No rare, threatened or endangered species of plants or animals will be impacted by the development. Of the approximate 49.80 acres of woodland conservation required, all will be in the form of existing preservation on site. The applicant is actually proposing the retention of 57.10 acres of existing preservation on site. An additional condition was established for a future Detailed Site Plan (DSP) to address the appearance of the proposed lots and appropriate treatment for the scenic easement with review elements to include Preservation of existing woodlands; Enhancement of the scenic easement with landscaping; The location, appropriate setback and lighting of all lots and

---

7. Flynn's testimony is discussed at more length *infra.*

residences adjacent to Aquasco Road (MD 3 81); The location and type of lighting on the public road; and The conservation of rural character. Conservation easements are required over the environmental features to additionally provide for the retention of environmentally sensitive areas. The lotting pattern established provides for the implementation of high-end estate housing. The transportation system was found to meet the minimum level of service (LOS) C criteria established for the Rural Tier. . . . The 2002 General Plan established seven goals for the Rural Tier. While it is acknowledged that this specific property, with this specific development proposal will not retain sustainable agricultural land, nor will it limit non-agricultural uses, it will preserve environmentally sensitive features; it will help to maintain rural character; it will allow for large lot estate residences; it will protect the land owners' equity in their land; and it will maintain the integrity of the rural transportation system.

The Resolution, in explaining its analysis of the basis upon which the preliminary plan was approved, made no mention of the General Plan's numeric residential growth objective for the Rural Tier.

The Greater Baden–Aquasco Citizens Association and eight individual area residents (collectively, the "Citizens") filed in the Circuit Court for Prince George's County a petition for judicial review of the Commission's action. The Circuit Court remanded the case to the Planning Board for further consideration and additional findings. Specifically, the Circuit Court found that the Planning Board did not articulate findings of fact with regard to conformance with all relevant recommendations of the General Plan and applicable Area Master Plan and that there was not substantial evidence in the record to support the Planning Board's conclusion that the Preliminary Plan conformed with the General and Master Plans. The Commission and the Developer appealed to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court affirmed the judgment of the Circuit Court.

The Commission filed a timely petition for writ of certiorari.[8] We granted the petition, 407 Md. 529, 967 A.2d 182 (2009), to consider the following somewhat argumentatively framed questions:

I. Does the lower court's decision improperly usurp the County Council's legislative function by imposing an interpretation of the General Plan that the Council expressly did not intend?

II. Would the lower court's decision unduly subject the Commission to innumerable lawsuits and effect a de facto moratorium on development in the County's rural tier?

## II. THE OPINION OF THE COURT OF SPECIAL APPEALS

The Commission and the Developer, before the Court of Special Appeals, disputed the Circuit Court's judgment that there was not substantial evidence to support the Planning Board's approval of the Preliminary Plan. The intermediate appellate court interpreted its opinion in *Archers Glen Partners, Inc. v. Garner*, 176 Md.App. 292, 933 A.2d 405 (2007), *aff'd on other grounds*, 405 Md. 43, 949 A.2d 639 (2008), a case involving a different preliminary subdivision plan application for residential development within the Rural Tier of the County, to hold that the General Plan's numeric residential growth objective was "binding" on the Planning Board. Because the Planning Board did not consider the numeric growth objective in the present case in its Resolution or in its deliberations, the intermediate appellate court concluded that there was not substantial evidence that the application conformed with the Master Plan and the General Plan.

According to the Court of Special Appeals, "when the evidence in a given case generates a material issue as to

---

8. The Developer did not join the Commission's Petition or file one of his own. Consequently, he is not a party to the present appellate proceedings.

compliance with that objective," the Planning Board must address the General Plan's numeric growth objective viz-a-viz the preliminary plan application before it. The court found that the following testimony by Flynn in the present case generated a material issue as to the proposed subdivision's compliance with the numeric growth objective:

Since the adoption of the General Plan, the goal of capturing less than one percent of the County's dwelling unit growth for the Rural Tier has been exceeded and has resulted in action by [the District] Council to place a moratorium on growth, which has now expired in the Rural Tier, and to attempt to develop a TDR [Transfer of Development Rights] program to meet growth and preservation mandates outlined in the General Plan.

The court resolved that the Planning Board did not address adequately in its Resolution the numeric growth objective.

The intermediate appellate court also concluded that the Planning Board's "verbatim recitation" of the written Technical Staff Report and recommendation in the Board's Resolution "was the functional equivalent of stating 'the Planning Board agrees with everything in the Staff Report' and concluding the matter at that point. Under the circumstances of this case, the Planning Board's approach is unacceptable." The court found that the Resolution's "rote repetition of a Staff Report does not constitute meaningful fact finding where the Staff Report does not clearly articulate the requisite relationship between the facts and the law." [9]

---

9. We decline to adopt the Court of Special Appeals's general conclusion on this point. In *Montgomery v. Bd. of County Comm'rs for Prince George's County*, 256 Md. 597, 261 A.2d 447 (1970), we found that, in a zoning action and under the facts of that case, it was not appropriate for the District Council to adopt by reference the Technical Staff Report's and the Planning Board's findings into its statutorily required written findings of fact because they were not sufficient. *Id.* at 603, 261 A.2d at 451. We noted, however, that although it "is not a practice to be encouraged, we are not prepared to rule, as a matter of law, that the District Council may not, in a specific case, comply with the statutory requirement to make written findings of basic facts and conclusions of either the Planning Board or of the Technical Staff by

Even where the Planning Board "engaged in independent fact finding during its discussion of 'community planning' considerations," the court determined that its "findings of fact are also insufficient and do not permit our review of the [numeric growth objective] issue raised by the Commission and Developer...." The court explained, however, that the "Planning Board retain[ed] discretion ... in its interpretation and application of the binding provisions of the Master and General Plans to a preliminary subdivision plan." The Court of Special Appeals, therefore, affirmed the Circuit Court's judgment and endorsed remand of the case to the Planning Board for further factual findings and appropriate conclusions of law.

## III. STANDARD OF REVIEW

■■■ Our review of an administrative agency's [10] action generally is a narrow and highly deferential inquiry. *Trinity Assembly of God for Balt. City, Inc. v. People's Counsel for Balt. County*, 407 Md. 53, 78, 962 A.2d 404, 418 (2008) (*"Trini-*

specific reference to those findings." *Id.* at 603, 261 A.2d at 450–51. The Court of Special Appeals also stated in the context of a zoning action that "there is nothing inherently improper if the decision that the [District] Council adopted, i.e., the [Zoning Hearing Examiner's] decision, in turn adopts and incorporates reports and recommendations of other public offices—so long as the adopted findings and conclusions with each of the reports are sufficiently articulated, clear, and specific." *Colao v. County Council of Prince George's County*, 109 Md.App. 431, 460–61, 675 A.2d 148, 163 (1996). We know of no reason not to analyze here the Planning Board's conduct similarly.

We note that the Planning Board did not simply incorporate by reference the Technical Staff's Report. It included large portions of the report in the Resolution and added additional findings of fact and conclusions. The Board's adoption of a substantial portion of a Staff Report does not give rise, in and of its mere adoption, to an adverse inference that the Board abdicated its task to exercise independent judgment. The omission in the findings of a required consideration is the focus of our analysis here.

10. The Commission, when acting in a quasi-judicial manner, such as in the present case, is considered a State agency. *See, e.g. Md.-Nat'l Capital Park and Planning Comm'n v. Washington Grove*, 408 Md. 37, 53, 968 A.2d 552, 561 (2009) ("The [Commission] is an agency of the State of Maryland.").

*ty Assembly of God*") (citing *People's Counsel for Balt. County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008)); *United Parcel Serv., Inc. v. People's Counsel for Balt. County*, 336 Md. 569, 576, 650 A.2d 226, 230 (1994). "When reviewing the decision of a local [planning] body, ... we evaluate directly the agency decision, and, in so doing, we apply the same standards of review as the circuit court and intermediate appellate court." *Trinity Assembly of God*, 407 Md. at 77, 962 A.2d at 418 (2008) (citing *Loyola College*, 406 Md. at 66, 956 A.2d at 173). Our review is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc.*, 336 Md. at 577, 650 A.2d at 230; *see also Trinity Assembly of God*, 407 Md. at 78, 962 A.2d at 418; *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007); *Lee v. Md.-Nat'l Capital Park and Planning Comm'n*, 107 Md.App. 486, 492, 668 A.2d 980, 983 (1995). "A conclusion by [the planning body] satisfies the substantial evidence test if 'a reasonable mind might accept as adequate' the evidence supporting it." *Trinity Assembly of God*, 407 Md. at 78, 962 A.2d at 418 (citing *Loyola College*, 406 Md. at 67, 956 A.2d at 174); *see also Surina*, 400 Md. at 681, 929 A.2d at 910.

 We owe less deference, however, to "the legal conclusions of the administrative body and may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute." *Surina*, 400 Md. at 682, 929 A.2d at 911 (citing *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 267–68, 734 A.2d 227, 232 (1999)); *Trinity Assembly of God*, 407 Md. at 78, 962 A.2d at 419. Although we review the administrative body's legal conclusions with less deference than its factual findings, "[w]hen determining the validity of those legal conclusions ... 'a degree of deference should often be accorded the position of the administrative agency' whose task it is to interpret the

ordinances and regulations the agency itself promulgated." *Surina*, 400 Md. at 682, 929 A.2d at 911 (quoting *Marzullo v. Kahl*, 366 Md. 158, 172, 783 A.2d 169, 177 (2001)).

In the present case, we must determine whether the Planning Board was required by relevant statutory law to consider the residential growth recommendation of the applicable plans in reaching its conclusion that the Preliminary Plan conformed to the requirements of the Subregion VI Master Plan and the Countywide General Plan. If so required, we then ordinarily would determine whether substantial evidence supported its conclusion. Because of our answer to the first stage analysis, we shall not reach the second inquiry.

## IV. LAND USE PLANS

### A. Land Use Plans Generally

The terms "Master Plan" and "General Plan," as guides to growth and land development, while distinct under most land use statutes and regulations, do not possess universal meanings nationally and are often used interchangeably. *See* Patricia E. Salkin, American Law of Zoning § 5:3 (5th ed.2009). "Since there are many shades of opinion among planners as to the precise content, the specific emphasis, and the degree of particularity, not all would agree on a definition of such a plan." *Id.* For purposes of general discussion of land use plans, the terms "Master Plan" and "General Plan" frequently are conflated in the broad term "comprehensive plan." Generally, a comprehensive plan is described as "a general plan to control and direct the use and development of property in a [locality], or a large part thereof, by dividing it into districts according to the present and potential use of the property." E.C. Yokley, Zoning Law and Practice § 5–2 (4th ed.2003). It usually is "more than a detailed zoning map and should apply to a substantial area, be the product of long study, and control land use consistent with the public interest. An important characteristic of a comprehensive plan is that it be well thought out and give consideration to the common needs of the particular area." *Id.*

Commentators and scholars generally agree that the purposes of a comprehensive plan include:

(1) To improve the physical environment of the community as a setting for human activities—to make it more functional, beautiful, decent, healthful, interesting, and efficient. . . .

(2) To promote the public interest, the interest of the community at large, rather than the interests of individuals or special groups within the community. . . .

(3) To facilitate the democratic determination and implementation of community policies on physical development . . . .

(4) To effect political and technical coordination in community development. . . .

(5) To inject long-range considerations into the determination of short-range actions. . . .

(6) To bring professional and technical knowledge to bear on the making of political decisions concerning the physical development of the community. . . .

Salkin, *supra*, at § 5:5 (quoting T.J. Kent, Jr., The Urban General Plan 25 (1964)).

Many state statutes require that zoning and land development be accomplished "in accordance with a comprehensive plan." Yokley, *supra*, at § 5–1. *See e.g.*, Ariz.Rev.Stat. Ann. § 9–462.01F (2008 & Supp.2009) ("All zoning and rezoning ordinances or regulations adopted under this article shall be consistent with and conform to the adopted general plan of the municipality, if any. . . ."); Cal. Gov't Code § 65860(a) (West 2009) ("County or city zoning ordinances shall be consistent with the general plan of the county or city. . . ."); Fla. Stat. § 163.3194(1)(a) (LexisNexis 2009) ("After a comprehensive plan, or element or portion thereof, has been adopted . . . all development undertaken by, and all actions taken in regard to development orders by, governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted."); Ga.Code Ann. § 36–70–3(1) (2006 & Supp.2009) ("The governing bodies of municipalities and counties are authorized: (1) To develop, establish, and

implement land use regulations which are consistent with the comprehensive plan of the municipality or county. . . ."); Or. Rev.Stat. § 197.010(1)(c) (2007) (declaring the legislature's intent that comprehensive plans shall be implemented through "more specific rules and land use regulations.").

## B. Maryland and Prince George's County Specifically

Maryland zoning and planning enabling statutes, enacted by our General Assembly, provide for comprehensive plans.[11] Non-charter counties and municipalities with zoning and planning powers are governed by Article 66B of the Maryland Code (1957 & 2003 Repl.Vol. & Supp.2009) generally. Some provisions of Art. 66B, however, also apply to charter counties, such as Prince George's County.[12] For example, § 1.04(a) provides that a "charter county shall enact, adopt, amend, and execute" a comprehensive plan. The section also lists the required elements for the comprehensive plan. The comprehensive plan shall include a transportation element, a mineral resources plan, a water resources plan, "recommendations for land development regulations to implement the comprehensive plan," and a sensitive areas element. *Id.* § 1.04(b). The county is charged with ensuring the implementation of the comprehensive plan through zoning and other land use regulations, including subdivision ordinances and regulations. *Id.* § 1.04(f).

Section 3.01 of Art. 66B addresses the adoption of a comprehensive plan by non-charter counties and municipalities (§ 3.01 is not applicable to charter counties. *See* § 1.03). The

---

11. Section 1.00(h)(1) describes a "plan" to mean "the policies, statements, goals, and interrelated plans for private and public land use, transportation, and community facilities documented in texts and maps which constitute the guide for area's future development." A plan "includes a general plan, master plan, comprehensive plan, or community plan adopted in accordance with § § 1.04 and 3.01 through 3.09 of this article." *Id.* § 1.00(h)(2).

12. Charter counties also draw their zoning and planning powers from Art. 25A, § 5(X) of the Md.Code. This section has no direct bearing, however, on the outcome in the present case.

plan shall "[s]erve as a guide to public and private actions and decisions to insure the development of public and private property in appropriate relationships. . . ." *Id.* § 3.05(a)(2). Section 3.05 describes the plan and its required elements.[13] Any regulations adopted by the local legislative body "shall be adopted: (1) in accordance with the plan." *Id.* § 4.03(a)(1).

Montgomery and Prince George's Counties receive additional and special statutory treatment with regard to zoning and planning in Article 28 of the Md.Code. In Montgomery and Prince George's Counties (charter counties), the Commission is authorized, at the direction of the County Council, sitting as the District Council, to create a general plan for the entire Regional District. Art. 28, § 7–108(a)(1)(i).[14] The general plan shall contain the Commission's recommendations for development in the regional district. *Id.* § 7–108(a)(2). The District Council may direct the Commission to prepare the general plan based on studies and considerations of, among others, "existing and forecasted" population growth, development, transportation needs, housing needs and demands, and transportation needs. *Id.* § 7–108(a)(3). The District Council

---

13. The required elements, in pertinent part, are as follows:

(i) A statement of goals and objectives, principles, policies, and standards, which shall serve as a guide for the development and economic and social well-being of the jurisdiction;
(ii) A land use plan element, which:
 1. Shall propose the most appropriate and desirable patterns for the general location, character, extent, and interrelationship for the uses of public and private land, on a schedule that extends as far into the future as is reasonable ...
Md.Code art. 66B, § 3.05(a)(4).

14. Pursuant to Article 28, § 8–101(a) of the Maryland Code (1957, 2003 Repl.Vol. & Supp.2009), "[t]he County Councils of Montgomery County and Prince George's County are each individually designated, for the purposes of this article, as the district council for that portion of the regional district lying within each county, respectively." The "regional district" is those areas of Montgomery and Prince George's counties (most of the areas of these counties really) subject to the Commission's authority. § 7–102.

Section 8–101(b)(2) gives the District Council the authority to adopt and amend zoning ordinances, and § 7–116 the authority to adopt subdivision regulations.

also may provide "[t]hat the Commission shall consider various alternative concepts of growth or development in preparing the general plan...." *Id.* § 7–108(a)(4)(i). The purpose of the general plan is

> guiding and accomplishing a coordinated, comprehensive, adjusted, and systematic development of the regional district, the coordination and adjustment of this development with public and private development of other parts of the State of Maryland and of the District of Columbia, and the protection and promotion of the health, safety, morals, comfort and welfare of the inhabitants of the regional district.

*Id.* § 7–110.

As part of the countywide general plan, Article 28, § 7–108(b) provides that, "to the extent necessary and feasible," the Commission shall adopt a map of the county, dividing the county into planning areas, subject to the approval of the District Council. The Commission shall adopt, and, from time to time, amend and revise, "a local master plan for each planning area ..." *Id.* § 7–108(b)(1)(iii). Master plans differ from General Plans in that "[m]aster plans govern a specific, smaller portion of the County and are often more detailed in their recommendations than the countywide General Plan as to that same area." *Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 48 n. 5, 949 A.2d 639, 642 (2008). The District Council may provide that the "local master plan may include recommendations for zoning, staging of development and public improvements, and public services relative to the implementation of the plan...." *Id.* § 7–108(b)(1)(iv). The District Council may also provide that "a local master plan shall be based upon and include in greater detail, but need not be limited to, the same factors, elements, and conditions as contained in the general plan...." *Id.* § 7–108(b)(1)(vi). Furthermore, the District Council may provide that the "local master plan or any amendment thereto shall be, upon adoption by the Commission and approval by the appropriate district council, an amendment to the general plan if so designated by that district council." *Id.* § 7–108(b)(2).

The District Council for Prince George's County and the Commission, in reliance on the applicable statutory provisions, have created both local master plans and a general plan. We next shall recount the plans that bear on the subject property of this case.

### 1. The 2000 Biennial Plan

The Prince George's County Council [15] created Commission 2000, a 53–member, broad-based advisory community panel with a charge to "recommend a comprehensive growth management plan for Prince George's County and a strategy to achieve it." Commission 2000, *Biennial Growth Policy Plan: Final Report* 1 (2000) (the "Biennial Plan"); *see also* Prince George's County, Md., No. CR–62–1998 (resolution adopted "[f]or the purpose of establishing a broad-based public panel representing all segments of the County to work with the Prince George's County Council, County Executive, Planning Board and Planning · Department of the M–NCPPC to (1) prepare a Biennial Growth Management Plan. . . ."),[16],[17] Com-

---

**15.** The Resolution creating Commission 2000 was adopted by the County Council, not its doppelganger, the District Council. *See* Prince George's County, Md., CR–62–1998 (Resolution establishing Commission 2000). In contrast, when approving the Biennial Plan, the Resolution was adopted by the County Council, sitting as the District Council.

**16.** Prior to the 2000 Biennial Plan, the County had adopted two countywide General Plans: the 1964 General Plan and the 1982 General Plan. Md.-Nat'l Capital Park and Planning Comm'n, *Prince George's County Approved General Plan* 15 (2002). The 2002 General Plan described the prior countywide plans:

The 1964 *General Plan* recommended that development in Prince George's County be concentrated in the urban ring within the Capital Beltway or in one of three development corridors radiating out from the urban ring. The three corridors were: (1) the urbanized area along U.S. 1, extending to Laurel and beyond to Baltimore; (2) the area along U.S. 50, extending to Bowie and beyond to Annapolis; and (3) the area between Indian Head Highway and Branch Avenue (centering around a proposed Southeast Freeway), extending to the Charles County line. Each corridor was planned to be served for its entire length by highspeed rail transit. Between these urban development corridors, large wedges of open space would be preserved. The 1982 *General Plan* focused primarily on the interrelationship of future development with other elements, such as economic develop-

mission 2000's "fundamental recommendation" was the creation of a heretofore new concept of identifying "growth tiers ... to guide future land use and development in Prince George's County." *Id.* "The three tiers encompass the developed, developing and rural areas of the County." *Id.* The District Council approved the Biennial Growth Policy Plan (the "Biennial Plan") on 24 October 2000, with amendments not relevant here. *See* Prince George's County, Md., CB–80–2000 (24 October 2000). One of the goals and objectives of the Biennial Plan is to "[p]reserve rural, agricultural and scenic areas" so that "Prince George's County will retain a rural area in addition to urban and suburban environments by protecting rural character, preserving rural lands and retaining viable operations in rural areas." *Id.* at 9. Additionally, "scenic areas will be identified and protected throughout the County." *Id.* A priority of the Plan is farmland preservation. The Plan states that "the County will facilitate the long-term retention of viable agricultural operations and avoid inappropriate development of rural lands. Non-farm development in rural areas will avoid infringement." *Id.* at 11. The Biennial Plan established growth objectives to achieve these objectives and priorities. With regard to the Rural Tier, the objective was to "[s]low dwelling unit growth ... to 0.75 percent of total Countywide dwelling unit growth over the next 20 years." *Id.*

---

ment, environment, transportation, housing, and public facilities. For the most part, the plan set forth policies without recommendations for the location and intensity of specific land uses. The 1982 *General Plan* did make more specific recommendations for transportation facilities; the transportation element of the *General Plan* served as the Master Plan for Transportation. The 1982 *General Plan* has been subject to piecemeal amendment by subsequent area plans. *Id.* at 15–16, 968 A.2d 552.

**17.** The Commission's Technical Staff provided the principal staff support for Commission 2000. *Biennial Plan,* at 6. In conducting its "initial deliberations," the Commission staff collaborated with Commission 2000 to "under[take] an initial analysis of four possible alternative growth patterns for the County." *Id.* Commission 2000 ultimately settled on the "tier" alternative "by defining three broad subareas—or tiers—within which growth management priorities and policies would be roughly similar, and by identifying what the policies would be for each of these tiers." *Id.* at 7, 968 A.2d 552.

at 12. The Biennial Plan also lists several reasons, ranked in order of importance, why rural areas are important to the County: "Provision of open space, Environmental protection, Agricultural land retention, Rural character preservation, Equity for property owners, Support for viable agricultural operations, Infrastructure/service cost control, Supporting compact urban growth, [and] Residential growth." *Id.* at 22.

## 2. The 2002 General Plan

On 7 October 2002, the District Council approved a "new" General Plan [18] for the County, superceding the General Plan of 1982. Prince George's County, Md., Resolution No. CR–47–2002 (7 October 2002). The Commission was an active participant in the preparation of both General Plans. *See id.* (stating that the Commission initiated, with the concurrence of the District Council, the preparation of the General Plan, held open meetings and hearings, and published informational brochures regarding the General Plan). The sustaining

> purpose of the General Plan is to provide broad guidance for the future growth and development of Prince George's County while providing for environmental protection and preservation of important lands. This guidance is expressed as goals, objectives, policies, and strategies that, taken together, determine the preferred development pattern and the transportation system, public facilities and environmental features needed to accommodate that pattern.

Md.–National Capital Park and Planning Comm'n, *Prince George's County Approved General Plan* 13 (2002).

The General Plan adopted the growth tier structure of the Biennial Plan. It changed, however, the numeric growth objective for the Rural Tier from less than 0.75 percent to a goal of capturing less than 1 percent of the County's dwelling unit growth by the year 2025. *Id.* at 27. The General Plan states

---

18. *See supra* note 5 (explaining the authority of the District Council to adopt a General Plan for the Regional District).

that this objective is a measure, among others, that "will be used to gauge the success of [the Plan's] implementation." The General Plan described the Rural Tier as follows:

The Rural Tier is comprised of the eastern and southern portions of the county in the Patuxent River, Potomac River, and Mattawoman Creek watersheds. It encompasses approximately 150 square miles, or approximately 32 percent of the county's total land area. The Rural Tier is the most scenic part of the county and is characterized by fine landscapes, most of the county's remaining farms, extensive woodlands, numerous streams, and diverse wildlife habitat. Development activity includes mining and widely dispersed, large-lot residential home sites. The community structure dates back over 300 years and historic roadways and structures dot the landscape. Public land holdings account for large portions of the Rural Tier, including extensive park and federal agency properties. Although large-lot estate development is anticipated in this Tier, it needs to be carefully balanced with agricultural pursuits and preservation to maintain its rural character. The preservation of the remaining environmentally sensitive features in this Tier is a priority for any future development.

*Id.* at 40.

The General Plan also described the "vision [19] for the Rural Tier" to be to protect "large amounts of land for woodland,

---

**19.** Maryland Code (1957, 2003 Repl.Vol. & Supp.2009), Article 66B, § 1.01 defines the term "vision." Section 1.01 applies to charter counties.

Section 1.01 provides, in relevant part:
[A] commission shall implement the following visions through [a comprehensive plan] . . . :
(1) Quality of life and sustainability: a high quality of life is achieved though universal stewardship of the land, water, and air resulting in sustainable communities and protection of the environment;
(2) Public participation: citizens are active partners in the planning and implementation of community initiatives and are sensitive to their responsibilities in achieving community goals;
(3) Growth areas: growth is concentrated in existing population and business centers, growth areas adjacent to these centers, or strategically selected new centers;

wildlife habitat, recreation and agricultural pursuits, and preservation of the rural character and vistas that now exist." *Id.* at 5. To achieve that "vision," the General Plan lists seven "goals": (1) "[p]reserve environmentally sensitive features;" (2) "[r]etain sustainable agricultural land;" (3) "[m]aintain rural character;" (4) "[a]llow large-lot estate residences;" (5) "[l]imit nonagricultural land uses;" (6) "[p]rotect landowners' equity in their land;" [and] (7) "[m]aintain the integrity of a rural transportation system." *Id.* at 40.

In 2008, the Commission published the General Plan Growth Policy Update for Prince George's County. The Growth Policy Update reported that, from 2002–2007, the Rural Tier of the County captured 3 percent of the County's total dwelling

(4) Community design: compact, mixed-use, walkable design consistent with existing community character and located near available or planned transit options is encouraged to ensure efficient use of land and transportation resources and preservation and enhancement of natural systems, open spaces, recreational areas, and historical, cultural, and archeological resources;

(5) Infrastructure: growth areas have the water resources and infrastructure to accommodate population and business expansion in an orderly, efficient, and environmentally sustainable manner;

(6) Transportation: a well-maintained, multimodal transportation system facilitates the safe, convenient, affordable, and efficient movement of people, goods, and services within and between population and business centers;

(7) Housing: a range of housing densities, types, and sizes provides residential options for citizens of all ages and incomes;

(8) Economic development: economic development and natural resource-based businesses that promote employment opportunities for all income levels within the capacity of the State's natural resources, public services, and public facilities are encouraged;

(9) Environmental protection: land and water resources, including the Chesapeake and coastal bays, are carefully managed to restore and maintain healthy air and water, natural systems, and living resources;

(10) Resource conservation: waterways, forests, agricultural areas, open space, natural systems, and scenic areas are conserved;

(11) Stewardship: government, business entities, and residents are responsible for the creation of sustainable communities by collaborating to balance efficient growth with resource protection; and

(12) Implementation: strategies, policies, programs, and funding for growth and development, resource conservation, infrastructure, and transportation are integrated across the local, regional, State, and interstate levels to achieve these visions.

unit completions, compared to the less than 1 percent growth objective (if considered untethered from its temporal focus date of 2025) established in the General Plan.

### 3. The Subregion VI Master Plan

The Property in the present case is located in the Subregion VI Study Area of the County. The Subregion VI Study Area is subject to an area master plan. The goal of the Subregion VI Master Plan (the "Master Plan") is "[t]o preserve the rural character of the Subregion VI Study Area." Prince George's County Planning Dep't, *Subregion VI Study Area Approved Master Plan* 61 (1993). Unlike both the Biennial and General Plans, the Master Plan does not contain expressly a textual objective or goal expressed as a percentage of countywide residential growth that should occur within the Rural Tier within Subregion VI. The Master Plan, however, states that its provisions are meant to be "generally" consistent with the General Plan. *Id.* at 3.[20]

### V. THE PARTIES' CONTENTIONS

The Commission's primary argument in this litigation is that the Planning Board is not obliged to evaluate the General Plan's numeric residential growth objective for the Rural Tier (or its potential effect, if applied at any point in time prior to 2025) at the time of any preliminary plan of residential subdivision approval in the Rural Tier. It asserts that the Court of Special Appeals, in opining to the contrary, usurped the District Council's legislative prerogative to decide who and what, if anything, controls residential growth in the Rural

---

20. We note solely for historical purposes that the District Council approved a new Subregion VI Master Plan and Sectional Map Amendment (the latter being a reference to a concurrent comprehensive rezoning of the Subregion VI Planning area) on 15 September 2009. Although not germane to the proceedings here because the 2009 Master Plan was not in existence at the time the Developer's application was filed and acted on by the Planning Board, the 2009 Master Plan states that a purpose of the plan is "[t]o implement the policies and recommendations contained in the 2002 *Prince George's County Approved General Plan.*" Md.-Nat'l Capital Park and Planning Comm'n *Approved Subregion VI Master Plan and Sectional Map Amendment* 5 (2009).

Tier. The Commission points out that the General Plan contains many goals and objectives that focus on concerns that it contends largely are irrelevant to the subdivision review process, such as employment opportunities, the tax base, housing quality, revitalization, and the design of structures and land improvements. Another irrelevant objective, it argues, is the numeric growth objective, a long-term objective designed to measure whether the County is meeting its goals, policies, and objectives in the Rural Tier and one which the District Council intended for its direct monitoring of growth activity through the Growth Policy Updates. The District Council intended, as the argument continues, for growth to be controlled through mechanisms other than the subdivision process, such as conservation easements pursuant to § 24–152 of the County Code [21] and that the Council did not intend for the Planning Board to account for or enforce the growth objective as a function of approving or disapproving subdivision applications in the Rural Tier.

The Commission does not dispute that the County Code requires that the Planning Board must determine broadly,

---

**21.** Section 24–152 of the Prince George's County Code provides, in relevant part:

(a) **Applicability.** Conservation subdivision design shall be required for all preliminary plats of subdivision for residentially zoned land located in the Rural Tier approved after June 30, 2006....

\* \* \*

(g) **Conservation area.**

(1) The conservation area shall be located on a parcel or lot and characterized as primarily scenic, agricultural, historic or environmental, or any combination.

(A) A conservation easement for the purpose established on the preliminary plat shall be placed on the conservation area at the time of final plat.

Subtitle 24 of the County Code is the Subdivision Ordinance (or Regulations, as sometimes called). Although even pointing to § 24–152 somewhat belies the Commission's argument that the County or District Council did not intend for growth management considerations to be in play at the time of subdivision, the Commission's more relevant point here is perhaps that, while the Council could have intended conservation easements as a vehicle to regulate growth, it did not necessarily intend the general numeric growth objective in the General Plan to be a basis upon which to disapprove a proposed subdivision.

before it may approve a preliminary subdivision plan, that it conforms to the applicable Master Plan. It argues, nonetheless, that if the Planning Board is required to address the numeric growth objective in its subdivision review process in every application proposing residential development in the Rural Tier, it will cause the Commission, applicants, and the County to incur an undue hardship by encouraging "innumerable baseless lawsuits" and impose a de facto moratorium (for at least some period of time) on further residential development in the County's Rural Tier.[22]

The Citizens argue that the Court of Special Appeals held correctly that the Planning Board must consider if and how the proposed subdivision complies with the numeric growth objective. They argue that the plain language of the applicable County ordinances, planning documents, and Maryland case law makes clear that the growth objective must be a part of the Commission's subdivision review analysis. In response to the Commission's undue hardship augury, the Citizens retort that it is wrong factually and irrelevant legally. They contend that, in accordance with "classic principles of administrative law,"[23] the Board has ready access to up-to-date information on residential growth and is required to track growth data and articulate findings based on that information. Undue hardship is not a reason to be excused from complying with the law in these circumstances.

## VI. OUR ANALYSIS

 This case presents the opportunity to weigh in on a dispute that has been simmering in Prince George's County apparently for several years.[24,25] We decide here whether the

---

**22.** For reasons we shall explain, this prophecy is not necessarily self-fulfilling.

**23.** The Citizens do not enumerate or describe in their Brief what they contend are the applicable "classic principles of administrative law."

**24.** *See Archers Glen Partners, Inc. v. Garner,* 176 Md.App. 292, 315, 933 A.2d 405, 418 (2007) (holding that the General Plan's growth objectives

Planning Board, at the least, must consider the General Plan's numeric growth objective when determining whether to approve or reject a preliminary subdivision plan. For the reasons set forth below, we answer that question in the affirmative.

■■■ The appellate courts of Maryland have discussed on many occasions the legal effect of land use plans in the context of the subdivision approval process and various other land use contexts.[26] In the context of zoning actions, Master Plans have been viewed generally as non-binding advisory recommendations, unless a governing statute or ordinance clearly elevates them to the status of a regulatory device. *See, e.g., Trail v. Terrapin Run, LLC,* 403 Md. 523, 535, 943 A.2d 1192, 1199 (2008) (noting that, as opposed to subdivision contexts,

for the Rural Tier were made part of the area Master Plan). In *Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 48 n. 5, 949 A.2d 639, 642 (2008), we noted, "[a]lthough we shall not decide here any issue regarding the legal effect of the recommendations of the General Plan in the subdivision review process, the parties' apparent dispute over that point looms in the background." *Garner* suggests the current issue has been in dispute within the County for as far back as 2003, when the Planning Board approved initially the preliminary plan in that case. 405 Md. at 48, 949 A.2d at 642.

25. We do not imagine that what we opine here will resolve this dispute for all time because, as Judge James Eyler noted in the Court of Special Appeals's denial of a motion for reconsideration in *Archers Glen,* "much of what [the parties] complain of, the language in the County Code and the Plans, lies within the power of the District Council . . . to [change]." 176 Md.App. at 327, 933 A.2d at 425.

26. We noted the difference between zoning regulation and subdivision regulation in *People's Counsel for Balt. County v. Surina,* 400 Md. 662, 929 A.2d 899 (2007):

It is well-settled that zoning regulations and subdivision controls regulate different aspects of the land use regulatory continuum. While zoning laws define the uses that are permitted in a particular zoning district . . . subdivision regulations inform how, when, and under what circumstances a particular tract may be developed. Included in these subdivision controls are provisions which require the developer/property owner to construct infrastructure improvements of various types necessary to support "uses" permitted in the zone by the applicable zoning ordinances.

*Id.* at 688–89, 929 A.2d at 914–915 (internal citations omitted).

"generally, Master Plans, Comprehensive Plans, and the like, are advisory, guides only, and not normally mandatory insofar as rezonings, special exceptions, conditional uses and the like are concerned."); *Pattey v. Bd. of County Comm'rs*, 271 Md. 352, 360, 317 A.2d 142, 147 (1974) ("[A] master plan is only a guide and is not to be confused with a comprehensive zoning, zoning *map*, or zoning classification. . . ."); *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 315, 289 A.2d 303, 309 (1972) (noting that a master plan is "a guide for the future"); *but see* subsequent statutory changes in the 2009 legislative session that purport to abrogate to some extent the holding in the *Terrapin Run* decision.[27,28]

---

**27.** In *Terrapin Run*, a developer applied to the Board of Appeals of Allegany County (a non-charter county) for a special exception to establish a mixed-use development. 403 Md. 523, 528, 943 A.2d 1192, 1195–96. The local zoning ordinance contained no requirement that the Board, before approving the special exception, make any finding viz-a-viz the special exception's relationship to the local comprehensive plan. In the definition of "special exception" contained in Art. 66B, § 1.00(k), however, the Legislature provided that it

means a grant of a specific use that would not be appropriate generally or without restriction and shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, *that the use conforms to the plan* and is compatible with the existing neighborhood.

*Id.* § 1.00(k) (emphasis added).

Section 1.00(k) notwithstanding, the Board of Appeals granted the application on the basis that the proposed development would be "in harmony" with the local comprehensive plan. *Id.* at 529, 943 A.2d at 1196. The Board reasoned that the Plan was a mere guide and not regulatory in nature. *Id.* The Court of Appeals held that, absent language in the local zoning ordinance requiring strict conformity, the words "conform to" in the then extant version of Article 66B, § 1.00(k) did not require strict compliance to the comprehensive plan. *Id.* at 526–27, 574, 943 A.2d at 1194, 1222. We further held that the proper standard to be applied is the less demanding "in harmony with" standard. *Id.* at 527, 943 A.2d at 1194.

**28.** The Preamble to House Bill 297, as enacted in Chapter 181 of the 2009 Laws of Maryland, stated the General Assembly's intent to abrogate prospectively this Court's holdings in *Terrapin Run*. The Preamble provides, in pertinent part:

WHEREAS, Land use planning in the State of Maryland has revolved around comprehensive plans enacted by local governments, following the eight visions established in the Economic Growth, Resource Protection, and Planning Act of 1992; and

In the context of subdivision matters, it is equally well established that the recommendations of a master plan may be binding to the extent there is a statute, regulation, or ordinance requiring that a proposed subdivision conform to the master plan. *Coffey v. Md.-Nat'l Capital Park and Planning Comm'n,* 293 Md. 24, 25, 441 A.2d 1041, 1041 (1982); *Bd. of County Comm'rs v. Gaster,* 285 Md. 233, 250, 401 A.2d 666, 674 (1979) ("The county here has preordained by its subdivision regulations that one who seeks to cut up a larger tract by creating a subdivision must not disrupt the master plan and that the subdivision must be compatible with that master plan."). In *Mayor and Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 814 A.2d 469 (2002), we observed that,

WHEREAS, The decision of the Maryland Court of Appeals in *David Trail, et al. v. Terrapin Run, LLC et al.,* 403 Md. 523[, 943 A.2d 1192] (2008) held that a special exception could be granted even if it did not strictly conform to the comprehensive plan; and

WHEREAS, While the holding of the Terrapin Run decision could be narrow and confined to the granting of special exceptions, the General Assembly is concerned that a broader interpretation of the decision could undermine the importance of making land use decisions that are consistent with the comprehensive plan; and

WHEREAS, Article 66B, § 4.09 of the Annotated Code of Maryland requires a local jurisdiction to implement the provisions of its local comprehensive plan through "the adoption of applicable zoning ordinances and regulations, planned development ordinances and regulations, subdivision ordinances and regulations, and other land use ordinances and regulations that are consistent with the plan;" and

WHEREAS, Citizens invest countless hours in determining the future direction of their jurisdiction through local comprehensive plans; and

WHEREAS, The people of Maryland are best served if land use decisions are consistent with locally adopted comprehensive plans; and

WHEREAS, It is the intent of the General Assembly to encourage the development of ordinances and regulations that apply to locally designated priority funding areas and allow for mixed uses and bonus densities beyond those specified in the local comprehensive plan by excluding land uses and densities or intensities in the definition of "consistency" for priority funding areas; and

WHEREAS, It is the intent of the General Assembly, as evidenced in Article 66B, §§ 1.03(e) and 4.09, that comprehensive plans should be followed as closely as possible while not being elevated to the status of an ordinance and that deviations from the plan should be rare. . . .

where the local government has enacted a statute, ordinance, or regulation that links planning and zoning, "they serve to elevate the status of comprehensive plans to the level of true regulatory device." *Id.* at 530, 814 A.2d at 478. "[W]here such a statute or ordinance exists, its effect is usually that of requiring that zoning or other land use decisions be consistent with a plan's recommendations regarding land use...." *Id.* at 531, 814 A.2d at 478–79 (citing *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 117 Md.App. 607, 635–51, 701 A.2d 879, 893–901 (1997)); *see also Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 699, 526 A.2d 598, 606 (1987) (noting that "master plans are not invariably advisory. For example, a county's subdivision regulations may validly require subdivision proposals to conform to a master plan."). Noting that "the weight to be accorded a master plan or comprehensive plan recommendation depends upon the language of the statute, ordinance, or regulation establishing the standards pursuant to which the decision is to be made," *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 117 Md.App. 607, 636, 701 A.2d 879, 893 (1997) (footnote omitted), the Court of Special Appeals explained that, in examining the relevant statute or ordinance, a court ought to apply the standard cannons of statutory interpretation. "In such cases, we look first to the words of the applicable statute, ordinance, or regulation to divine what the enabler intended the weight to be accorded by the ultimate decision-maker to a recommendation of the plan." *Id.*

In *Coffey*, we recognized a binding nature for the recommendations of a master plan in subdivision cases, according to the subdivision regulations of the Prince George's County Code. 293 Md. at 25, 441 A.2d at 1041. As it does now, the then extant County Code required subdivision plats to conform to the master plan.[29] *Id.* We held that, "when subdivi-

---

**29.** Relevant to the dispute in *Coffey*, the 1979 Prince George's County Subdivision Regulations provided:

(a) The subdivider shall observe the following general requirements and principles of land subdivision:

sion regulations require that a proposed subdivision comply with the master plan, an application for approval of a preliminary subdivision plan that fails to so comply must be rejected." *Id.* The applicable master plan at the time Coffey submitted an application for approval of a preliminary subdivision plan proposed a residential density range of 2.7 to 3.5 dwelling units per acre for the part of the County where Coffey's property was located. *Id.* His subdivision application proposed a density of 7.38 dwelling units per acre. *Id.* Because the Master Plan was deemed binding based on the Council's adoption of the approval criterion in the subdivision regulations of "conformity" to the plan, we held that the Commission was justified in rejecting Coffey's proposed subdivision that failed to conform to the master plan. *Id.* at 31, 441 A.2d at 1044. The analysis in the present case is not so linear, however, because the relevant Master Plan does not contain an express numeric residential growth objective or an express requirement that the Planning Board consider the numeric growth objective of the General Plan.

Article 28, § 7–115(a)(1) of the Maryland Code, (1957, 2003 Repl.Vol.) requires that any subdivision of land within the "regional district" be approved by the Commission. The Commission is required to apply the subdivision regulations enacted by the District Council when determining whether to approve a subdivision plan within the parts of the County within the regional district (which includes the subject property in the present case). *Id.* §§ 7–116–7–117; *see also Garner,* 405 Md. at 47 n. 3, 949 A.2d at 642 ("The Commission, in making its determinations, applies the subdivision regulations of Prince George's County for subdivision proposals in that County."). The County's Subdivision Regulations provide that a proposed subdivision "plat shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate or the District Council has

---

(1) The plat shall conform to the Master Plan.

not imposed the recommended zoning." Prince George's County Code § 24–121(a)(5).

There is no mention in § 24–121(a)(5) requiring conformance to the Countywide General Plan, although § 24–104(a)(2) of the County Code notes that one of the purposes of the subdivision regulations is to "guide development *according to the General Plan,* area master plans, and their amendments." (emphasis added). Furthermore, the Subregion VI Master Plan states that it is generally in accordance with the General Plan. *Master Plan, supra,* at 3.

In *Archers Glen Partners, Inc. v. Garner,* 176 Md.App. 292, 933 A.2d 405 (2007), *aff'd on other grounds,* 405 Md. 43, 949 A.2d 639 (2008), the Court of Special Appeals considered a factually similar case presenting the very issue that we consider today.[30] A developer filed an application for approval of a preliminary subdivision plan proposing residential units on property located in the Rural Tier of the County. The Planning Board approved the application, finding that the preliminary plan was consistent with the land use provisions in the same General Plan and Master Plan in the present case. The Circuit Court for Prince George's County affirmed the Planning Board's decision. Several citizens and the Greater Baden–Aquasco Citizens Association appealed to the Court of Special Appeals. That court vacated the Circuit Court's judgment and remanded the case to the Planning Board, concluding that the Planning Board failed to articulate, with adequate specificity, findings of fact supporting its conclusion that the application conformed to the Master Plan and General Plan. On remand, relevant to the General Plan and the numeric growth objective, Alan Hirsch[31] testified before the Planning Board as follows:

---

**30.** The Greater Baden–Aquasco Citizens Association was also a party in *Archers Glen Partners.* 176 Md.App. at 296 n. 3, 933 A.2d at 408.

**31.** The same Technical Staff representative testified at the Planning Board hearings in the present case, albeit less fulsomely on the relevant topic in this case than he did in *Archers Glen.*

> [T]he ultimate development of 47 lots created by this subdivision are not in conflict with the hundreds of dwelling units envisioned in the rural tier over the next approximate 25 years, given 1 percent of the County's residential growth in that timeframe.
>
> I would like to conclude by stating the seven goals of the rural tier as listed in the 2002 General Plan. While it is acknowledged that . . . this specific property with a specific development proposal will not retain sustainable agricultural land or limit nonagricultural uses, it will preserve environmentally sensitive features, it will maintain rural character, it will allow large lot estate residences, it will protect land owners' equity in their land, and it will maintain the integrity of the rural transportation system.

*Id.* at 320, 933 A.2d at 421–22. The citizens did not cross-examine Mr. Hirsch with regard to his testimony regarding conformance to the numeric residential growth limitation in the General Plan, nor did they present any legal arguments before the Board or the Circuit Court based on the 1 percent numeric growth objective in the Rural Tier. *Id.* at 321–23, 933 A.2d at 422. The Planning Board re-approved the preliminary subdivision plan. The citizens again petitioned for judicial review in the Circuit Court. The Circuit Court, remaining dissatisfied with the agency's efforts, remanded the case again to the Planning Board for further consideration and findings. The developer and the Planning Board appealed that judgment to the Court of Special Appeals.

The intermediate appellate court discussed the relationship between the General Plan and the Master Plan. Applying our holding in *Coffey* and the "conform to" language in the subdivision regulations' criteria for approval of a subdivision, the court held "that the Master Plan is a binding document." 176 Md.App. at 315, 933 A.2d at 418. That did not end the court's analysis, however, because the Master Plan, as noted, does not repeat or expressly contain a numeric residential growth objective. *Id.* The court concluded that the 2002 General Plan's Countywide goals, policies, plans, objectives, and strategies, including growth objectives, amended partially the 1993

Master Plan. *Id.* at 315, 933 A.2d at 418. Specifically, the court found that, based on the fact that the Master Plan states that it is intended to be in accordance with the General Plan, the Master Plan "must be consistent and compatible, and to the extent it is not, the General Plan prevails." *Id.*

The intermediate appellate court was careful to note, however, that the Planning Board had discretion (the exercise of which is entitled to deference upon judicial review) with respect to applying the growth objective and balancing it against the other goals, objectives, policies, and strategies that are part of the Master Plan. *Id.* at 316, 933 A.2d at 419. With respect to the numeric residential growth objective, the court concluded as follows:

> Attainment of goals is dependent on many factors, including the nature, extent, and effectiveness of implementing regulations, and to some extent, the decision making of bodies such as the Planning Board. The function of interpreting and applying the Plans rested with the Planning Board, and subject to the substantial evidence test, it had discretion to determine whether the preliminary subdivision plan conformed to the Master Plan and to the goals, objectives, policies, and strategies in the General Plan.

*Id.*

The court in *Archers Glen* then considered whether the evidence presented at the Planning Board hearing was sufficient to support the Board's approval of the preliminary subdivision plan. The Court of Special Appeals concluded that Mr. Hirsch's testimony at the second hearing constituted substantial evidence, sufficient to support the Planning Board's decision that the developer's preliminary subdivision plan conformed to both Plans. *Id.* at 323, 933 A.2d at 423. Noting that "[t]he Planning Board is in the best position to determine whether the preliminary subdivision plan conformed to the County's Plans," the court reversed the Circuit Court's judgment and remanded the case with instructions to affirm the Planning Board's decision. *Id.*

In contrast to his testimony in *Archers Glen*, neither Mr. Hirsch nor his colleague mentioned the numeric residential growth objective in either the Technical Staff Report or in their testimony before the Board, although Mr. Hirsch discussed generally the goals of the General Plan and stated that the Preliminary Plan was "not inconsistent with the requirements, or at least the visions and goals established by the General Plan of 2002." As noted *supra*, Joanne Flynn of the Greater Baden–Aquasco Citizen's Association invoked in her opposition testimony, albeit briefly, the numeric residential growth objective. She stated that, since 2002, the Rural Tier of the County captured more than 1 percent of the County's dwelling unit growth, causing the District Council to place a temporary moratorium on growth, which moratorium had expired prior to the time the Developer submitted the present application for preliminary subdivision plan approval. The Citizens did not cross-examine Mr. Hirsch with regard to the Technical Staff's conclusion that the application was "not inconsistent" with the General Plan. The Resolution stated that the application was not inconsistent with the General Plan and repeated certain goals found in the General Plan to buttress its approval, but without addressing the residential growth objective.

We agree generally with the Court of Special Appeal's reasoning in *Archers Glen* and hold that the numeric residential growth objective regarding the Rural Tier in the General Plan amended and was incorporated into the Master Plan. Pursuant to the County's subdivision regulations, before the Planning Board approves a preliminary subdivision plan, it must conclude that the application conforms to the applicable Master Plan. In reaching that conclusion, the Planning Board must consider the numeric residential growth objective of the General Plan. The proposed subdivision represents additional potential residential dwelling units in the Rural Tier. The Planning Board understood the implications of an identical situation in *Archers Glen*, but seems here to have forgotten this point.

Our holding does not usurp the District Council's legislative function because our interpretation is in harmony with the plain language of § 24–121(a)(5) and with the language of the Master Plan. The Master Plan states that it is intended to be "in accordance" with the General Plan. The General Plan contains an objective, that, by 2025, the Rural Tier should contain less than 1 percent of the County's dwelling unit growth. Available statistics reflect that residential growth in the Rural Tier between 2002 and 2007 did not track the 1 percent objective, albeit with 18 years to go before declaration of ultimate success or failure in attaining the objective is ascertainable. Although it is mandatory that the Planning Board consider the numeric residential growth objective, it has leeway in that regard, especially where the 2025 horizon selected in the growth objective remains relatively distant at the present time. Even assuming residential growth in the Rural Tier in the short term may be in excess of the long term objective, the Board is not compelled necessarily to deny all residential subdivision applications coming before it in the Rural Tier until the desired equilibrium is attained.

The Planning Board, in determining whether a preliminary subdivision plan conforms to the Master Plan, either must offer some analysis of how the preliminary subdivision plan under consideration may impact the long-term growth objective established in the General Plan or explain why such an analysis or conclusion is not required, as provided in § 24–121(a)(5) of the County Code. What the Board cannot do, however, is ignore entirely a patently relevant element of the Plan.

 We concede the Commission's point that approval of a preliminary subdivision plan is not tantamount to final approval of dwelling unit growth or that actual construction pursuant to an approved subdivision plan is inevitable. Subdivision approval, however, is a necessary and critical step towards approval and construction of a residential subdivision. A final plan of subdivision, once approved and recorded, usually determines the maximum number and type of dwelling units that

may be allowed to be erected on a subject property. Therefore, it is necessary that the Planning Board at least account for how, if at all, the proposed subdivision might affect residential growth in the Rural Tier, even if some modest assumptions must be made, and more difficult decisions deferred to later in the development process.

We agree with the Commission that there are several goals and objectives in the General Plan that may not be related to the purposes and reach of the subdivision approval process and, therefore, need not be analyzed or considered in that process, notwithstanding public clamor to the contrary. For example, the General Plan contains goals and objectives related to employment opportunities, the tax base, housing quality, revitalization, and the design of structures and land improvements. These goals and objectives may be irrelevant to the subdivision approval process generally or because of the nature of a specific subdivision application. The numeric residential growth objective in the Rural Tier, however, is patently relevant to a residential subdivision proposal in the Rural Tier.

We also acknowledge the Commission's argument that the District Council has acted to create certain other mechanisms intended to control and track residential growth in the Rural Tier. For example, § 24–152(a) of the Prince George's County Subdivision Regulations establishes that, with two exceptions, "conservation subdivision designs" shall be incorporated in proposed residential subdivisions in the Rural Tier. The regulation requires a conservation easement on a parcel within the subdivision designed to retain the agricultural and open space features of the subject property. § 24–152(g)(1)(A). The creation of this mechanism, however, does not relieve the Planning Board of its statutory responsibility to consider the numeric growth objective in deciding whether a preliminary plan conforms with the Master Plan.

 We agree with the intermediate appellate court's statement in *Archers Glen* that the Planning Board, after balancing and considering all elements, "is in the best position

to determine whether the preliminary subdivision plan con-
formed to the County's Plans." 176 Md.App. 292, 323, 933
A.2d 405, 423. Unlike what the Planning Board did in consid-
ering the numeric growth objective in its second hearing in
*Archers Glen*, the Board here did not consider any bearing the
Preliminary Plan might have on the growth objective in the
Rural Tier. Although we typically accord deference to the
administrative body that interprets regularly the regulations
applicable to the task before it, *People's Counsel for Balt.
County v. Surina*, 400 Md. 662, 682, 929 A.2d 899, 911 (2007),
here the Planning Board did not even consider in its conformi-
ty analysis a relevant and applicable provision of the Master
Plan/General Plan, as required by the County Subdivision
Regulations. The Board's conclusion that the application was
"not inconsistent with the 2002 General Plan Development
Pattern policies for the Rural Tier" was a broad conclusory
statement and not based on sufficient facts in the record
before it. Such a half-baked conclusion is not entitled to
deferential review. *See Bucktail, LLC v. County Council of
Talbot County*, 352 Md. 530, 553, 723 A.2d 440, 450 (1999)
("Findings of fact must be meaningful and cannot simply
repeat statutory criteria, broad conclusory statements, or boil-
erplate resolutions.").

Requiring the Planning Board to consider the numeric
residential growth objective in subdivision cases does not lead
inexorably to a de facto moratorium on new residential devel-
opment proposals in the Rural Tier. As a more sensitively-
framed version of the venerable aphorism goes, "there may be
many ways to skin a [trophy animal]." With a benchmark
judgment day in the year 2025, there may come a time or
times along the way when a moratorium on development in
the Rural Tier becomes desirable to the minds of the govern-
ing body (provided the pace of residential development in the
Developed and Developing Tiers does not restore the overall
desired ratio). Perhaps the Planning Board may find cause to
deny a subdivision application based on the growth objective.
On yet another hand, perhaps the Board will find it necessary
only to catalog at discrete points in time the relative assumed

contribution of each proposed subdivision towards the growth objective, so that the District Council may be aware of where matters rest at that stage of the development process and take appropriate action. The list of possibilities explored here is neither exhaustive nor exclusive. What is plain, however, is that the Planning Board may not ignore the numeric growth objective in the Rural Tier in the subdivision process.

## VII. Conclusion

We affirm the Court of Special Appeals's judgment on the ground that the Planning Board should have considered the General Plan's numeric residential growth objective in the Rural Tier in determining whether the Preliminary Plan conformed to the Master Plan. Our holding in all other respects is more narrow than that expressed in the opinion of our brethren on the intermediate appellate court. We do not subscribe to the view that the Planning Board did not engage otherwise in meaningful fact-finding because its Resolution approving the Preliminary Plan was a "rote repetition" of the Technical Staff Report. It is not unreasonable for the Planning Board to rely on a Staff Report, as the Planning Board did in this case, if the Staff Report is thorough, well conceived, and contains adequate findings of fact.[32]

We also do not reach the same conclusion as the Court of Special Appeals with regard to whether a material dispute was created on this record by opposition testimony regarding the proposed subdivision and the General Plan's numeric growth objective (triggering the need for the Board to respond). Flynn's testimony stated that the level of residential growth in the Rural Tier exceeds the objective. Given the Board's familiarity with this issue, as demonstrated in *Archers Glen*, it was placed fairly on notice by Flynn's testimony to address the numeric growth objective in this case, as it did in *Archers Glen*. The Commission does not argue to this Court, nor could it argue, that the substance of Flynn's point was a surprise to it. In fact, the Commission included spontaneously in the

---

**32.** *See supra* note 9.

Appendix to its brief here the relevant General Plan Growth Policy Update, which supports Flynn's assertion that the Rural Tier captured well in excess of 1 percent of the County's dwelling unit growth prior to consideration of the subdivision proposal in this case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THIS CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH DIRECTIONS TO REMAND THIS CASE TO THE PRINCE GEORGE'S COUNTY PLANNING BOARD FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY PETITIONER.**

I join in the majority opinion except the last paragraph before section **VII.** I especially disagree with its musing that

Perhaps the Board will find it necessary only to catalog at discrete points in time the relative assumed contribution of each proposed subdivision towards the growth objective, so that the District Council may be aware of where matters rest at that stage of the development process and take appropriate action.

In my view, the Planning Board falls short of its mission if all it does is to "catalog" how each approved subdivision is likely to contribute to the growth objective. To merely "catalog" is not planning at all, and with this language, the majority emasculates the growth control remedy that it professes to uphold, i.e., requiring the Planning Board to consider numeric residential growth in evaluating proposed subdivisions. The Board, in making a decision whether to approve a preliminary subdivision, must substantively consider the effect of that subdivision on numeric residential growth. This does not mean that the Board must stop approving all subdivisions in the Rural Tier *at this time* on the grounds that the growth rate in recent years portends eventual violation of the long-term growth objective. But it is tasked with responsibility to act in accordance with the General and Master Plans in its approval process. To say that it may simply "catalog" numer-

ic growth without considering whether to work towards the goal by slowing down its approvals in the Rural Tier is tantamount to granting the Planning Board license to ignore this aspect of the Master Plan.

Judge BATTAGLIA and Judge BARBERA authorize me to state that they join this concurrence.