28 A.3d 147

Bryan J. MILLER

v.

**CITY OF ANNAPOLIS HISTORIC PRESERVATION COMMISSION.**

No. 219, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Sept. 6, 2011.

---

**614**

Ann M. Fligsten, Arnold, MD, for Appellant.

Gary M. Elson, Annapolis, MD, for Appellee.

Panel: DEBORAH S. EYLER, WOODWARD and GRAEFF, JJ.

GRAEFF, J.

This appeal involves the installation of fiberglass columns, rather than wood columns, in the reconstruction of a front porch in the Annapolis Historic District. Bryan Miller, appellant, received approval from the Historic Preservation Commission of the City of Annapolis (the "Commission") to build a porch with wood columns. Instead, he installed fiberglass columns. The Commission then rejected his application for an after-the-fact Certificate of Approval to permit him to keep the fiberglass columns. He appealed to the Circuit Court for Anne Arundel County, which affirmed the decision of the Commission.

On appeal to this Court, Mr. Miller presents several questions for our review,[1] which we have consolidated and rephrased as follows:

1. Did the Commission err in evaluating the Millers' application pursuant to guidelines for "rehabilitation" rather than "new construction?"

2. Did the Commission exceed its authority in enacting a guideline that deems the use of fiberglass columns "not acceptable?"[2]

---

**1.** The questions presented, as they appear in Mr. Miller's brief, are as follows:

 1. Did the [Commission] err when it evaluated the application under guidelines for rehabilitation?
 2. Did the [Commission] exceed its authority by banning fiberglass in new construction or reconstruction?
 3. Is it good public policy to mandate inferior materials in reconstruction?
 4. Did the [Commission's] concern with setting precedent by approving fiberglass columns in the Historic District lead to an erroneous decision?

**2.** Mr. Miller's third question asks the Court to evaluate the Commission's "public policy" regarding the use of substitute materials in the Annapolis Historic District. Such a question is not appropriate for judicial review, and we will not address it. *See Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 36, 944 A.2d 1122 (2008) (" 'declaration of public policy is normally the function of the legislative branch of government' ") (quoting *Felder v. Butler*, 292 Md. 174, 183, 438 A.2d 494 (1981)).

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## STATUTORY BACKGROUND—PRESERVATION OF HISTORIC SITES

The Maryland General Assembly enacted the Historic Area Zoning Act (the "Act"), Md.Code. (1957, 2010 Repl.Vol.), Art. 66B §§ 8.01–8.17, with the stated purpose to "preserve sites, structures, and districts of historical, archeological, or architectural significance and their appurtenances and environmental settings." § 8.01.[3] Section 8.03(a)(1) provides for local governments to establish a historic preservation commission, and § 8.06(a)(1) directs municipalities to "adopt guidelines for rehabilitation and new construction design for designated sites, structures, and districts that are consistent with those generally recognized by the Maryland Historical Trust."

Pursuant to the Act, any individual seeking to "construct, alter, reconstruct, move, or demolish a site or structure located within" a designated historic district must apply for permission from the local historic preservation commission in certain circumstances. *Id.* § 8.05(a). These circumstances involve a project that will result in "any exterior changes ... which would affect the historic, archeological, or architectural significance of the site or structure, any portion of which is visible or intended to be visible from a public way." *Id.*

The Act limits the local Commission's grant of authority to review "only the exterior features of a structure." *Id.* § 8.07. With respect to the type of review given to proposed plans, the Act provides that a "historic preservation commission shall strictly judge plans for sites or structures determined by research to be of historic, archeological, or architectural significance." *Id.* § 8.08(a). There is an exception, however. Section 8.08(b)(2) provides that a local commission may not strictly judge plans involving "new construction," and must instead

---

**3.** The parties agree that the Millers' home is in the Annapolis Historic District.

apply a lenient standard, "[u]nless the plans seriously impair the historic, archeological, or architectural significance of the surrounding site or structure."

Pursuant to its authority under the Act, the Annapolis City Council established the Commission and granted it authority to review applications for Certificates of Approval for exterior changes to historic buildings. Annapolis City Code § 21.08.060 (2009). With respect to the level of the Commission's review, the guidelines provide, consistent with Art. 66B, as follows:

The Commission shall be strict in its judgment of plans for landmarks, sites or structures determined by research to be of historic, cultural, archaeological, or architectural significance. The Commission shall be lenient in its judgment of plans for landmarks, sites or structures of little historic, cultural, archaeological, or architectural significance, or of plans involving new construction, unless in the Commission's judgment such plans would seriously impair the historic, cultural, archaeological, or architectural significance of surrounding landmarks, sites or structures. The Commission is not required to limit construction, reconstruction, or alteration to any one period of architectural style.

§ 21.56.060(D).

The Annapolis City Code includes a definition of "new construction," as well as other terms relevant to this appeal. These definitions are as follows:

"New construction" shall mean construction which is characterized by the introduction of new elements, sites, buildings, or structures or additions to existing buildings and structures in historic districts.

\* \* \*

"Reconstruction" shall mean the process of reproducing, by new construction, the exact form and detail of a vanished structure, or part thereof, as it appeared at a specific period of time.

"Rehabilitation" shall mean the act or process of returning a property or building to usable condition through

repair, alteration, and/or preservation of its features which are significant to its historical, architectural, and cultural values.

*Id.* § 21.56.020.

The City Code authorizes the Commission to "adopt and utilize in its review of applications rehabilitation and new construction design guidelines and criteria for designated landmarks, sites, structures, and districts which are consistent with the U.S. Secretary of the Interior's [S]tandards *for* [R]ehabilitation." *Id.* § 21.08.060(E)(7). Pursuant to this authority, the Commission adopted a document titled: *Building In the Fourth Century: Annapolis Historic District Design Manual* (1994, revised 2007) (the "Design Manual"), which sets forth the criteria under which the Commission evaluates applications for Certificates of Approval. Section D, entitled "Guidelines to Preserve and Protect Structures and their Components," expressly adopts the Secretary of the Interior's Standards for Rehabilitation, *see* 36 C.F.R. § 68.3 (1995), "[e]xcept where more stringent requirements are stated in these guidelines." [4]

Several guidelines address porches and the materials to be used. Guideline D.23 recognizes the significance of a porch, stating that, "[f]or many vernacular buildings, the front porch is the most important visual and decorative building element in front of a simple building block." It states: "It is important that surviving porches retain their original form and materials."

Addressing the materials to be used to replace or add new elements, guideline D.28 specifically states: "Use of contemporary synthetic or fiberglass moldings, trim, and columns is not

---

**4.** The Secretary of the Interior's Standards for Rehabilitation include the following standards for replacement of deteriorated features:

Deteriorated historic features will be repaired rather than replaced. Where the severity of deterioration requires replacement of a distinctive feature, the new feature will match the old in design, color, texture and, where possible, materials. Replacement of missing features will be substantiated by documentary and physical evidence. 36 C.F.R. § 68.3(b)(6).

acceptable," and "[m]aterials that seek to replicate historic elements such as contemporary synthetic fiberglass moldings, trim, and columns should be avoided." Even for new buildings, guideline D.28c discourages the use of fiberglass, stating: "Materials that seek to replicate historic elements such as contemporary synthetic fiberglass moldings, trim, and columns should be avoided, as well as the use of aluminum, engineered wood, and or vinyl or plastic siding and trim along with cementitious synthetic wood products." [5]

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. and Ms. Miller are the owners of a home at 114 Market Street, located within the City of Annapolis Historic District. When the home originally was constructed between 1903 and 1908, a single-story porch was attached. The porch subsequently was torn down, and it was replaced with a brick stoop. The Millers learned of the existence of the porch through research, and they endeavored to reconstruct it.

On August 15, 2005, the Millers submitted to the Commission a request for permission to replace the original front porch. They described the project as follows: "Replace original front porch with wood elements and brick base. Construct Screening wall in driveway area with 4' brick columns & wrought iron screen." With respect to the columns on the porch, the Millers represented that the project would include: "Tapered wood columns with a 10 inch diameter and a profile to match the old photographs." The objective was to reconstruct the porch that existed when the property was first built between 1903 and 1908. The Commission approved the application on September 13, 2005.

Construction commenced. In 2006, the builder hired to construct the porch recommended that Mr. Miller use fiber-

---

**5.** The guidelines were revised in 2007, and the provisions related to the use of fiberglass were added at this time. Mr. Miller notes that this was after he had erected his columns. Because the application that is the subject of this appeal was submitted after the guidelines were revised, however, they are the relevant guidelines for this appeal.

glass instead of wood to build the porch columns. Without seeking a new Certificate of Approval from the Commission, Mr. Miller allowed the builder to install fiberglass columns.

In a letter dated October 15, 2007, the Commission informed Mr. Miller that it had learned that the columns installed on his porch "deviate[d] from the Certificate of Approval" issued by the Commission. The Commission advised Mr. Miller that his options at that point were either to install the columns the Commission had previously approved or to submit an application for approval of an after-the-fact installation.

On November 13, 2007, the Millers submitted to the Commission another Application for Certificate of Approval. His description of the project was as follows: "Application for after-the-fact installation of porch columns."

On January 8, 2008, the Commission held a hearing on the Millers' application. Ms. Miller testified that she and her husband had made a number of improvements to their property at 114 Market Street since 1996, largely in an effort to restore it to its original appearance. The Millers initially intended to build an exact replica of the original porch that was attached to the house when it was first constructed in approximately 1908, using an old photograph they had found. Because of various agency requirements, however, significant modifications were required. The porch was constructed in 2006 and painted in 2007.

Mr. Miller explained why fiberglass columns, rather than wood columns, were used in the construction of the porch. He stated that Steve Park, the builder, suggested using fiberglass instead of wood because of "serious maintenance problems caused by wood rotting." Additionally, the design of the porch had been modified to bring the porch into compliance with requirements of Public Works. In particular, a metal column was being added, which required the builder to split the wood to accommodate the metal column. Fiberglass, in contrast, would accommodate the metal column more easily. Mr. Miller believed that the fiberglass columns would be "indistinguishable" from the well-maintained wood columns

and would "cause no harm to the historic district." Accordingly, he decided to approve Mr. Park's suggestion to use fiberglass instead of wood to build the columns.

Mr. Miller testified that he did not seek approval from the Commission after deciding to switch the building materials for the columns because the project had already been delayed by Public Works, and he did not want any further delays, particularly because winter was approaching. He further stated that, when the project was in progress, he was unaware that the Commission's guidelines listed fiberglass as an unacceptable building material for the exterior of buildings in downtown Annapolis. Mr. Miller assured the Commission that, had he been aware of the guidelines, he would not have used fiberglass, and he asserted that he had not, at any time, attempted to conceal that he had not used wood columns.

Mr. Miller concluded his testimony by explaining why he believed he should not have to replace the fiberglass columns. Initially, he argued that the fiberglass columns were "indistinguishable from well maintained wood columns." Moreover, he asserted that fiberglass is a "compatible material for new construction" pursuant to the Commission's guidelines. Finally, he noted that his neighbors had complimented the columns on several occasions and commented that they looked like they were made from wood.

Mr. Park, who built the porch, explained why he recommended that Mr. Miller use fiberglass instead of wood for the porch columns. He stated that the base of a wood column is a common place for rotting and attracts insect infestation. Fiberglass columns, by contrast, do not rot or attract insects. Mr. Park opined that "wood columns are inferior" to fiberglass columns, and the quality of wood presently used to build such columns is far below what would have been used when the porch originally was constructed around 1908. He attributed the decline in the quality of wood to changes in practices in the lumber industry, in particular, the use of fast growing species of trees to comply with environmental and endangered species laws. Mr. Park described the fast growing wood as

far less rot resistant than species that previously were more popular. He also described wood columns as "hav[ing] a greater tendency to warp and twist when split and reinstalled," which would have been problematic because Public Works required a metal beam that would need to be covered by a column. Mr. Park testified that the fiberglass columns were visually identical to wood columns.

Mr. Tom Davies, the architect who designed the Millers' porch, similarly explained the problems with rotting that are associated with wood columns. He testified to the problem with using wood columns given the steel column required by Public Works. He explained that exterior wood columns require ventilation to ensure that the wood expands and contracts at an even rate and to prevent moisture build up inside the column, but the required steel column would block the ventilation inside a wood column, preventing the natural expansion and contraction of the wood. Mr. Davies concluded that using fiberglass was the most practical means to accommodate the steel column.

Patricia Blick, Chief of Historic Preservation for the City of Annapolis, suggested that the Commission reject Mr. Miller's application. Although noting that the "porch project did not remove the historic fabric" because the original porch had been removed, Ms. Blick stressed that the original application that had been approved by the Commission specified that wood columns would be installed, and Commission guideline D.28, regarding the use of contemporary materials, states that the use of fiberglass columns is unacceptable.

Ms. Blick emphasized that, although the Commission had adopted the Secretary of the Interior's Standards for Rehabilitation, it had the authority to enact stricter historic preservation standards, provided that they were consistent with the Secretary's standards. She quoted one of the Secretary's Standards for Rehabilitation, which states: "Deteriorated historic features shall be repaired rather than replaced. Where the severity of deterioration requires replacement of a distinctive feature, the new feature shall match the old in design,

color, texture, and other visual qualities, and where possible, materials." Ms. Blick described the following four circumstances in which substitute materials may be used: "(1) the unavailability of historic materials; (2) the unavailability of skilled craftsman; (3) inherent flaws in the original materials; and (4) code required changes." She stated that none of these exceptions applied to Mr. Miller's application, and she urged the Commission to reject Mr. Miller's application and require the installation of wood columns.

Richard Bierce, an architectural consultant, submitted a brief comment echoing Ms. Blick's conclusions. Jennifer Orrigo, representing the Historic Annapolis Foundation, concurred with Ms. Blick's conclusions, citing concern regarding "the precedent setting nature of [Mr. Miller's] application." She further noted that the Commission's guidelines specifically identified fiberglass as an unacceptable building material.

Dan Sams, who lived in Mr. Miller's neighborhood, testified that the fiberglass columns on Mr. Miller's porch are identical in appearance to wood columns. He stated that, although he "frequently turn[s] in perceived violations to the [Commission]," he never reported Mr. Miller's columns because he never perceived a violation of the Commission's regulations.

Mr. Sams, an administrator of federal and state tax incentives for the State of Maryland, testified that, had Mr. Miller applied for a tax incentive or an easement for the porch project, he would have applied the standards for reconstruction, not rehabilitation, in reviewing the application because "this was an entirely new construction and there was no historical material." [6] He maintained that, "[i]n the absence of . . . historic materials . . . the objective . . . in reconstruction is to recreate the appearance of the historic building for interpretive purposes." Although Mr. Sams acknowledged that traditional materials are always preferred, he stated that, "in some instances[,] substitute materials may be used if they

---

6. As discussed in more detail, *infra,* a significant issue in this case involved whether the porch was new construction.

are able to convey the same visual appearance." Fiberglass columns, he concluded, "convey the same visual appearance as the smooth wood column."

The Commission next heard from Kathleen Davies, who read a letter written to the Commission by Carter Gibson, Mr. Miller's next-door neighbor. Mr. Gibson's letter described the fiberglass columns as "very tasteful, handsome, and very practical," and he described the porch as "a welcome addition to the neighborhood." Mr. Davies observed that "a large part of the maintenance on the building[s] in the historic district is the repair and replacement of porch columns," and he opined that "it is time to allow more modern materials as long as the look and feel of the finished product doesn't change."

Gilbert Renault, a former chairperson of the Commission, challenged Ms. Blick's conclusion that, by requiring Mr. Miller to install wood columns, the Commission merely would be enforcing its high standards. He explained that it was not possible to "get columns made out of 19th century lumber anymore," and therefore, he urged the Commission to consider which material gives a better appearance, the lumber currently available, which he characterized as "vastly inferior to 19th century wood," or fiberglass. Mr. Renault argued that fiberglass gave a better appearance. He further testified that the Millers' porch project "was completely new construction," and that Mr. Miller did his "best to reproduce everything perfectly."

At the conclusion of testimony, the commissioners shared their views. Chairperson Sharon Kennedy described Mr. Miller's presentation as "interesting" but "unpersuasive," agreeing with Ms. Blick that the appropriate standard of review for the application was the standard of rehabilitation. She stated that the Commission's decisions were required to be "predictable, transparent, and consistent." She expressed the view that approval of fiberglass would run contrary to precedent.

Commissioner Mariah McGunigle spoke next, voicing her opposition to Mr. Miller's application. She maintained that

good quality wood was still available and that rotting and deterioration could be delayed by inserting a "short [ ] baluster" beneath the column. She also expressed concern about "fiberglass on a street that has high level pedestrian activity" because pedestrians would be able to touch it as they walked by. Ms. McGunigle stated that "having something that's a replaceable material that low to the public eye is concerning for me," and she opined that Mr. Miller's application did not meet the Commission's standards.

Kim Finch, another commissioner, stated that she believed Mr. Miller's porch project to be reconstruction because the original porch had not been in existence for a long time. She stated that the Secretary of the Interior's Standards for Reconstruction should apply, and that use of contemporary materials would be appropriate in this case because the project was aimed at reconstructing a historic feature, not preserving a historic feature itself.

Other commissioners expressed the view that approving Mr. Miller's application would establish a bad precedent, and it would permit the use of contemporary materials, which "is expressly prohibited in the guidelines." Commissioner Ginger Doyel questioned whether the fiberglass might be a more appropriate building material than wood to construct porch columns because the 19th century wood was no longer available, but she ultimately opposed Mr. Miller's application because approving fiberglass columns "would jeopardize the [C]ommission's need to be predictable, transparent, and consistent in its decision."

Commissioner Shelley Rentsch expressed support for Mr. Miller's application. Although she agreed that there was quality wood available that could be used on the porch project, she viewed the project as new construction, not rehabilitation, given railing height changes necessitated by the Annapolis City Code. Ms. Rentsch stated that, although a "trained eye" might, over time, be able to notice that the columns were made of fiberglass and not wood because the fiberglass columns would age more slowly, she concluded that the porch

"contribut[ed] to the quality of the street scape." Moreover, she interpreted guideline D.28 to provide some latitude for using substitute materials.

Before ordering the official vote on Mr. Miller's application, Chairperson Kennedy noted that, even if the Commission viewed the porch project as new construction, provision D.28c of the Commission's guidelines states that fiberglass should be avoided in projects seeking to replicate historical elements. She then ordered a vote, and the Commission rejected Mr. Miller's application by a vote of four-to-two.

On February 5, 2008, Mr. Miller filed a Notice of Appeal and Petition for Judicial Review of the Commission's January 8, 2008, decision rejecting his request for approval of "fiberglass columns on his front porch that had been installed instead of wooden columns." On February 25, 2008, the Commission filed a Notice of Intention to Participate.

On June 25, 2008, Mr. Miller filed a Memorandum in Support of Petition for Judicial Review. He argued that the Commission over-stepped its authority by banning fiberglass in the Historic District, that "the failure of the [Commission] to write an opinion makes the decision impossible to sustain," and that "it is bad public policy to require inferior materials in the [H]istoric [D]istrict."

On July 28, 2008, the Commission filed its answer to Mr. Miller's Petition for Judicial Review. It defended its decision on three grounds: (1) the decision was "based on sound preservation principles," and "[t]he use of non-traditional materials is inconsistent" with those principles; (2) the Commission "acted within the scope of its authority under State and Local law"; and (3) the decision was supported by substantial evidence. The Commission urged that, in the event that its findings were "deemed insufficient to support its conclusion," the court should remand, not reverse, its decision.

On August 8, 2008, Mr. Miller filed his reply memorandum. He maintained that, because the Commission did not issue a written opinion when it rejected his application, the circuit court was left to guess the rationale for the Commission's

decision. He argued that, "without findings of fact and conclusions of law it is impossible to discern what preservation principles were applied," and the court had no basis to review the Commission's decision. Mr. Miller further argued that the Commission exceeded the scope of its authority by adopting a guideline that deemed fiberglass "unacceptable" because State law empowered it merely to review materials for compatibility. On August 26, 2008, the circuit court remanded the matter to the Commission "for the issuance of written findings of facts and conclusions of law."

On October 14, 2008, Commissioners Rentsch and Finch issued a memorandum setting forth the opinion of the minority of the Commissioners regarding the Millers' application. They stated that standards for "reconstruction," as opposed to "rehabilitation," applied to the new porch addition. They set forth the Secretary of the Interior's Standards for Reconstruction, which provide, in pertinent part, that when "[r]econstructing a non-surviving building . . . substitute materials may be used as long as they re-create the historical appearance." The minority opinion concluded that, because the "columns installed do convey the appearance of the historic building and as no part of the original porch was existent at the time of reconstruction, requiring that wood be the only acceptable material goes beyond the most specifically related guidelines" promulgated by the Secretary of the Interior for the reconstruction of historic buildings.

On November 11, 2008, the Commission adopted findings of fact and conclusions of law regarding the Millers' application. The Commission's findings of fact were as follows: (1) Mr. Miller's home is a "historic structure, located in the C-1 Conservation Residence District under the Annapolis Zoning Code"; (2) the residence "was constructed between 1903 and 1908," and it initially "had a full width covered front porch, which was removed at some later date and replaced by a more contemporary narrow set of brick steps"; (3) evidence of the nature of the original porch came from several sources, including "two early photographs, 'ghosts' of pilasters, which were revealed when shingles were removed from the front of the

house," and a 1908 insurance map, which showed the outline of a one-story porch; (4) Mr. Miller used fiberglass columns in constructing the porch, rather than wood columns "as authorized in the initial Certificate of Approval"; and (5) "[a]s constructed ... the columns look similar to painted wooden columns."

The Commission then found, "as a matter of law, that the weight of the evidence supports denial of [the Millers'] application." The Commission discussed its decision to deny the application as follows:

> The applicants did not meet their burden of proof that the use of fiberglass material on columns of a replacement porch is "generally compatible" with 114 Market Street and the surrounding area. A decision to approve the use of fiberglass in the case would be contrary to the Annapolis Code, the [Commission] Guidelines, the Secretary of the Interior Standards for Rehabilitation, and prevailing preservation practices for the following reasons:
>
> A. 114 Market Street, constructed between 1903 and 1908, is an existing historic building in the Annapolis Historic District and thus the application for the Certificate of Approval to use fiberglass materials for columns on a replacement porch to that building is subject to strict scrutiny. The project is not "new construction" within the meaning of the code, which is defined under § 21.56.020 of the Annapolis Code as "construction which is characterized by the introduction of *new* elements, sites, buildings, or structures or additions to existing buildings and structures in historic districts," because the project involved the *replacement* of a once-existing porch. But for the fact that the project involved the replacement of a once-existing porch, the project would not have been approved.
>
> B. Pursuant to § 21.08.060, which governs the authority of the [Commission], and § 21.56, which governs approval of changes to historic districts, the standard of review is not whether fiberglass is more durable than wood or whether a difference between fiberglass or wood is discernible to the naked eye. Rather, the [Commission] is charged with de-

ciding whether the use of fiberglass materials is consistent with its design guidelines and the Secretary of the Interior's Standard[s] of Rehabilitation. The [Commission] Guidelines D.28 through D.28c and Rehabilitation Standard No.6 make clear that the use of traditional materials is preferable. They provide that contemporary materials are "not acceptable" and "should be avoided."

C. Departure from these directives is not justified in this case. Specifically, the [Commission] finds unpersuasive the Applicants' argument and supporting testimony, that fiberglass must be permitted in this case because wood is an inferior product, where good, quality wood is available; methods can be used to prolong the life of wood; the Applicants' contractor admitted that he had not used wood in 20 years; and only one column requires an interior, steel lolly post. The [Commission] also finds unpersuasive Applicants' argument and supporting testimony, that fiberglass must be permitted in this case because fiberglass is identical in appearance to wood, where authenticity is at stake, discernable differences between wood and fiberglass will appear over time because materials age differently, and the columns are located in a highly visible location.

D. The [Commission] finds that approval of fiberglass would thwart the [Commission's] mandate "to preserve and promote the preservation and appreciation of historic sites, structures and districts for the education and welfare of the citizens of the City," see Annapolis Code § 21.56.010(C), by undermining its ability to preserve the city's resources by requiring the use of traditional materials in future cases.

On December 9, 2008, Mr. Miller again filed an appeal to the circuit court. He argued that the Commission acted beyond the scope of its authority when it "impose[d] a ban on fiberglass columns on a newly or reconstructed porch," and he asserted that the fiberglass "columns as installed are compatible and should be approved." Finally, Mr. Miller argued that "it is unsound policy to mandate inferior materials in the Annapolis Historic District."

On April 17, 2009, the Commission filed its response, explaining that the Millers' home was "a historic building and thus was subject to strict scrutiny." It determined that Mr. Miller's project should be considered a "replacement of a once-existing porch," governed by rehabilitation standards. Pursuant to the rules on the rehabilitation of buildings with historic significance, "contemporary material is 'not acceptable' and 'should be avoided.'" Instead, wood, which had been approved in Mr. Miller's original proposal, would be a more appropriate material. The Commission emphasized that it was entitled "considerable deference by a reviewing court" because of the "specialized nature" of its work, and it asserted that it acted well within the scope of its authority. The Commission denied banning any materials from the Annapolis Historic District, and it dismissed Mr. Miller's assertion that fiberglass was compatible with other construction in the Annapolis Historic District as baseless and unsupported by law or credible evidence.

On February 17, 2010, the circuit court heard argument on Mr. Miller's appeal. Counsel for Mr. Miller argued that the porch project was new construction, and the Commission should have reviewed Mr. Miller's application for compatibility, a more lenient standard than the Commission applied when it utilized the strict standard of review intended for rehabilitation. She further argued that the Commission's action indicated that it had banned fiberglass, which it lacked the authority to do under the enabling statute.

In support of her argument that the porch project represented new construction, counsel argued that the Commission's rehabilitation guidelines refer to "replacing an element," but "[a] porch is a structure." Counsel maintained that the project must be considered new construction because "it cannot be identical to the old porch because ... we do not have the specifications," and "the building codes have changed," preventing the Millers from building an exact replica of the original porch. She concluded by arguing that it was bad policy to require individuals to use "inferior materials particu-

larly for new construction because new construction should use the materials that are standard in the industry."

Counsel for the Commission argued that the porch project constituted reconstruction, noting that reconstruction is defined as "the process of reproducing by new construction the exact form and detail of a vanished structure or part thereof as it appeared at a specific time." New construction, by contrast, "applies to buildings and structures that are put on existing unapproved lots or additions to existing buildings," such as an addition to a house. Because the porch was a "vanished structure," the Commission appropriately determined the porch project to be a reconstruction, and it had the authority to utilize a strict standard of review when considering Mr. Miller's application.

Counsel argued that the Commission reviewed Mr. Miller's application adhering to the appropriate legal standards, including those issued by the Secretary of the Interior, which encourages individuals to repair, not replace, deteriorated historic features and to aim to match materials when possible. He further noted that, although the Commission was required to implement guidelines consistent with those issued by the Secretary of the Interior, it was authorized to impose stricter standards. Counsel maintained that the Commission's decision was supported by substantial evidence, and he urged the court to uphold its decision.

Counsel also disputed the assertion that the Commission had banned fiberglass. He argued that, although the Commission's regulations state that fiberglass should be avoided, the Commission had the authority to permit fiberglass in certain circumstances.

The court issued its decision from the bench, affirming the Commission's ruling denying the application. It found that the Commission did not exceed its statutory authority or employ an unlawful review procedure. Noting that the Commission's technical expertise was entitled to deference, it stated that the decision was supported by "competent material and substantial evidence" and was not "arbitrary and capri-

cious." The court agreed with the Commission's conclusion that wood was available to build the columns, that a skilled craftsman would be able to install the columns, and that the Commission was justified in denying Mr. Miller's after-the-fact application to install fiberglass columns. The same day, the circuit court issued an order affirming the decision of the Commission denying Mr. Miller's application.

This timely appeal followed.

## STANDARD OF REVIEW

■ Appellate review of an administrative agency's determination "generally is a 'narrow and highly deferential inquiry.'" *Seminary Galleria, LLC v. Dulaney Valley Improvement Ass'n,* 192 Md.App. 719, 733, 995 A.2d 1068 (2010) (quoting *Maryland–Nat'l Capital Park & Planning Comm'n v. Greater Baden–Aquasco Citizens Ass'n,* 412 Md. 73, 83, 985 A.2d 1160 (2009)). This Court looks "through the circuit court's decision and evaluates the decision of the agency," *Chesapeake Bay Found., Inc. v. Clickner,* 192 Md.App. 172, 181, 993 A.2d 1163 (2010), determining " 'if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Seminary Galleria,* 192 Md.App. at 733, 995 A.2d 1068 (quoting *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994)).

■ With respect to the Commission's factual findings, we apply the substantial evidence test, which "requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the agency, we find a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Montgomery County v. Longo,* 187 Md. App. 25, 49, 975 A.2d 312, *cert. denied,* 411 Md. 357, 983 A.2d 432 (2009) (citations and quotations omitted). With respect to the legal conclusions, "appellate review is less deferential," and " 'this Court can reverse the agency's legal decisions where the legal conclusions reached by that body are based on

an erroneous interpretation or application of the zoning statutes, regulations, and ordinances relevant and applicable to the property that is the subject of the dispute.' " *Hubbel v. Bd. of Trs. of the Fire & Police Employees' Ret. Sys.*, 192 Md.App. 742, 749, 995 A.2d 1082 (2010) (quoting *P Overlook LLLP v. Bd. of County Comm'rs of Wash. County*, 183 Md.App. 233, 248, 960 A.2d 1241 (2008)). *Accord Baiza v. City of Coll. Park*, 192 Md.App. 321, 333, 994 A.2d 495 (2010) (" 'Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law.' ") (quoting *People's Counsel for Balt. County v. Loyola Coll. in Md.*, 406 Md. 54, 68, 956 A.2d 166 (2008)). Nevertheless, "a degree of deference should often be accorded the position of the administrative agency whose task it is to interpret the ordinances and regulations the agency itself promulgated." *Greater Baden–Aquasco*, 412 Md. at 84, 985 A.2d 1160 (citations and quotations omitted).

## DISCUSSION

Mr. Miller contends that the Commission erred in denying his after-the-fact application for a Certificate of Approval to use fiberglass instead of wood for the columns on his porch. He asserts two grounds of error in this regard.

First, he argues that the Commission erred in evaluating his application pursuant to guidelines for "rehabilitation" rather than "new construction." This is significant because, as indicated, the Annapolis City Code provides that the Commission should be "strict in its judgment of plans" of historic significance, but projects involving "new construction" should be afforded "lenient" review, unless in "the Commission's judgment such plans would seriously impair the historic, cultural, archaeological, or architectural significance of surrounding landmarks, sites or structures." § 21.56.060(D).

Mr. Miller characterizes his application as a proposal for reconstruction, and he argues that "[r]econstruction is part of new construction." He emphasizes that, when he initially submitted his application to the Commission, "there was no

porch," and there was nothing "left of the original porch to be repaired or to match." Finally, he posits that, even if the Commission correctly evaluated his application under rehabilitation standards, these standards provide that a replacement feature match original materials "where possible," and, in his case, "[e]xact replication was not possible because of current building code requirements."

Second, Mr. Miller argues that the Commission "does not have authority to ban a certain class of materials if they are compatible in a reconstruction." He contends that, although the Commission "may review materials for compatibility," it exceeded its authority "in enacting a guideline that deems the use of fiberglass columns 'not acceptable.' "

The Commission argues that it acted "within the scope of its authority in declining to approve [Mr.] Miller's after-the-fact application for a Certificate of Approval to substitute fiberglass for previously approved wood as the material for the columns of his front porch." It argues that it properly applied strict review of Mr. Miller's application for two reasons. First, it argues that "new construction" applies to projects introducing elements or structures that never existed, whereas Mr. Miller's application sought to replicate a previously existing structure, which fell within the definition of "reconstruction." The Commission states that Mr. Miller described the project in his initial application as a reconstruction, not new construction, noting that he included a picture of the porch originally attached to his home, which he sought to reconstruct "in exact form and with exact material," i.e., wood. Second, the Commission argues that, even if the porch project was new construction, Mr. Miller's after-the-fact application was subject to strict review because § 21.56.060(D) of the Annapolis City Code allows strict review of new construction if the Commission believes it "would seriously impair the historic, cultural, archeological, or architectural significance of the City of Annapolis Historic District."

With respect to Mr. Miller's argument that the Commission exceeded its authority in imposing a ban on the use of

fiberglass, the Commission denies that a ban exists. It argues that it has authority to determine if fiberglass is compatible with its historic district, and that it is entitled to deference in its finding in this case that it was not appropriate.

### A. Characterization of Porch Construction

We address first Mr. Miller's contention that the construction of the porch was "new construction" pursuant to Annapolis City Code § 21.56.060. Although the parties agree that the porch project was reconstruction, they disagree whether reconstruction properly can be construed as new construction.

In determining the appropriate standard of review for the issue whether Mr. Miller's porch project qualified as new construction, we find instructive the analysis in *Singley v. County Comm'rs of Frederick County*, 178 Md.App. 658, 943 A.2d 636, *cert. denied*, 406 Md. 114, 956 A.2d 202 (2008). In that case, the Frederick County Board of Appeals granted a special exception to a company to use its property for a commercial greenhouse/nursery. *Id.* at 662, 943 A.2d 636. This Court discussed the proper standard of review for the Board's determination whether the property constituted a "commercial greenhouse and nursery" that would be entitled to a special exception. *Id.* at 674–76, 943 A.2d 636. We explained:

> Statutory construction is an issue of law. *Del Marr v. Montgomery County*, 397 Md. 308, 315 [916 A.2d 1002] (2007). When interpreting the meaning of part of a county or local zoning code, we attempt to ascertain the intention of the drafters from the plain meaning of the words of the ordinance and we apply the canons of statutory construction when necessary to elucidate the meaning of the language. The Court of Appeals made clear in *Marzullo* [*v. Kahl*, 366 Md. 158, 172, 783 A.2d 169 (2001)] that, "with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily

be given considerable weight by reviewing courts." [ ] (citing *Lussier v. Md. Racing Comm'n,* 343 Md. 681, 696–97 [684 A.2d 804] (1996)); *see also Angelini v. Harford County,* 144 Md.App. 369, 373 [798 A.2d 26] (2002). Thus, "the expertise of [an] agency in its own field should be respected." *Marzullo, supra,* 366 Md. at 172 [783 A.2d 169].

In the case at bar, the Board's decision that Sugarloaf's proposed use of the Property is a "Commercial Greenhouse and Nursery," is a mixed question of law and fact that, under the dictates of *Marzullo v. Kahl, supra,* we review by applying a deferential standard that respects the Board's expertise in interpreting and applying the Code it administers. Accordingly, the question we must answer on review is whether the qualification vel non of the proposed use of the Property as a "Commercial Greenhouse and Nursery" is fairly debatable, that is, whether a reasoning mind could reasonably find that the proposed use indeed meets that qualification; and if so, whether there was substantial evidence in the record to support the Board's finding on that issue.

*Id.* at 675–76, 943 A.2d 636.

Similarly, in the present case, the Board's decision that the porch project was not new construction is a mixed question of law and fact. Pursuant to the analysis set forth in *Singley,* we will address whether a reasoning mind could find that the construction of the porch was not new construction, and if so, "whether there was substantial evidence in the record to support the [Commission's] finding on that issue." *Id.* at 676, 943 A.2d 636.

We answer those questions in the affirmative. As explained below, whether Mr. Miller's porch project constitutes new construction is fairly debatable, and the record contains substantial evidence to support the Commission's conclusion that it does not.

As indicated, the relevant terms at issue here are defined as follows:

"New construction" shall mean construction which is characterized by the introduction of new elements, sites, buildings, or structures or additions to existing buildings and structures in historic districts.

\* \* \*

"Reconstruction" shall mean the process of reproducing, by new construction, the exact form and detail of a vanished structure, or part thereof, as it appeared at a specific period of time.

"Rehabilitation" shall mean the act or process of returning a property or building to usable condition through repair, alteration, and/or preservation of its features which are significant to its historical, architectural, and cultural values.

Annapolis City Code § 21.56.020.

To be sure, as Mr. Miller argues, the definition of reconstruction includes the term new construction. As the Commission notes, however, the definition of "new construction" in the Annapolis City Code requires "the introduction of new elements . . . or structures or additions to existing buildings." § 21.56.020. Here, Mr. Miller was not introducing a new element; he was seeking to replace an original porch that had been removed.[7] Indeed, Mr. Miller, in his initial application to build the porch, described the project as reconstruction, not new construction.[8] The Commission's decision, that the porch

---

**7.** The Commission noted that, "[b]ut for the fact that the project involved the replacement of a once-existing porch, the project would not have been approved."

**8.** We note that the Annapolis City Code consistently refers to construction and reconstruction as separate actions. *See* § 21.56.060(E)(2) ("unless the Commission is satisfied that the proposed construction, alteration, or reconstruction will not materially impair the historic, cultural, archaeological, or architectural significance of . . . structure, the Commission shall reject the application"); § 21.56.040(A) ("Before a person may undertake the construction, alteration, reconstruction, rehabilitation . . . of a . . . structure within a designated historic district . . . the person . . . shall file an application for a certificate of approval with the Commission for permission.").

project was not new construction and was subject to strict review, was not arbitrary or capricious, and it was supported by substantial evidence.

## B. Ban on Fiberglass

Mr. Miller's second contention is that the Commission acted beyond its authority by imposing a ban on the use of fiberglass in the Annapolis Historic District. He asserts that the "plain language of [Commission Guideline] D.28 is a ban," but the Commission's authority is limited to review of materials for compatibility and does not permit a ban of materials. Moreover, he argues that the evidence produced at the January 8, 2008, hearing proved that the fiberglass columns were compatible with the wood columns installed on neighboring porches.

The Commission argues that "[t]here is no ban on the use of fiberglass." It notes that Mr. Miller never argued at the January 8, 2008, hearing that the Commission had improperly banned the use of fiberglass, and "[t]he word 'ban' was never used" in the deliberations of the Commission during or after the hearing. The Commission maintains that it has "a limited degree of flexibility to allow substitute materials for historic materials," but it was not appropriate in this case because Mr. Miller's "porch was on the front facade of [his] house and, therefore, very visible to pedestrian traffic."

 Initially, a review of the record confirms the Commission's assertion that Mr. Miller did not argue before the Commission, as he does on appeal, that guideline D.28 was an impermissible ban on the use of fiberglass in a porch column. Accordingly, this contention is not preserved for our review. *See Motor Vehicle Admin. v. Weller,* 390 Md. 115, 129, 887 A.2d 1042 (2005) ("We do not allow issues to be raised for the first time in actions for judicial review of administrative agency orders entered in contested cases because to do so would allow the court to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agen-

cy.") (quoting *Delmarva Power & Light Co. v. Pub. Serv. Comm'n*, 370 Md. 1, 32, 803 A.2d 460 (2002)).

██ Even if the issue was preserved, however, Mr. Miller's contention would be without merit. Three guidelines in the Design Manual address the use of substitute building materials. Guideline D.28 provides: "Use of contemporary synthetic or fiberglass moldings, trim, and columns is not acceptable . . . . Materials that seek to replicate historic elements such as contemporary synthetic fiberglass moldings, trim, and columns *should be avoided.*" (Emphasis added). Guideline D.28b states: "Materials used in building additions should be compatible with materials used on the existing building and should be appropriate to the style and consistent with the character of the original building." Guideline D.28c provides: "Materials used on new buildings should be appropriate to the scale and character of surrounding structures. Materials that seek to replicate historic elements such as contemporary synthetic fiberglass moldings, trim, and columns *should be avoided.*" (Emphasis added).

These guidelines direct that contemporary materials "should" be avoided. They do not provide that the materials "shall" be avoided. With respect to the difference between the terms "should" and "shall," we find the analysis in *Caudill v. Judicial Ethics Comm.*, 986 S.W.2d 435, 438 (Ky.1998) (Stephens, C.J., concurring), instructive:

In comparing the definitions of should versus shall, it becomes evident that their meanings, while similar, are indeed distinct. Should is used to express duty, obligation, necessity, propriety, or expediency. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2104 (3rd ed. unabridged 1993). Shall is used to express a command or exhortation. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2085. *Should, while definitely strongly encouraging a particular course of action, is permissive.* Shall requires a particular course of action and accordingly, is mandatory.

(Emphasis added). *Accord Perez v. State*, 420 Md. 57, 63, 21 A.3d 1048 (2011) (" 'When the Legislature commands that

something be done, using words such as "shall" or "must" rather than "may" or "should," the obligation to comply with the statute or rule is mandatory.' ") (quoting *State v. Green*, 367 Md. 61, 82, 785 A.2d 1275 (2001)).

The Commission's guidelines here, which use the word "should," strongly discourage the use of contemporary substitute materials, but it is still permitted. The Commission determined, however, that a deviation from its preference for the use of traditional material would be inappropriate in this case. Specifically, the Commission observed: (1) "good, quality wood is available"; (2) "methods can be used to prolong the life of wood"; (3) "only one column requires an interior, steel lolly post"; and (4) "discernable differences between wood and fiberglass will appear over time because materials ages differently, and the columns are located in a highly visible location."

Thus, even if the issue was preserved, the record does not support Mr. Miller's contention that the Commission exceeded its authority in imposing a ban on fiberglass. He states no meritorious claim for relief in this regard.

## CONCLUSION

The Commission's decision to deny Mr. Miller's application for an after-the-fact Certificate of Approval to permit him to keep the fiberglass columns installed on his reconstructed porch was supported by substantial evidence in the record and was not premised upon an erroneous conclusion of law. Accordingly, we affirm the circuit court's decision affirming the Commission's decision.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**