69 A.3d 528

**Gregory PRINGLE**

v.

**MONTGOMERY COUNTY PLANNING BOARD M–NCPPC.**

No. 2334, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 27, 2013.

G. Macy Nelson (Michael Kroopnick, Law Office of G. Macy Nelson, LLC, on the brief), Towson, MD, for Appellant.

Christina Sorrento, Silver Spring, MD, & Jody S. Kline (Miller, Miller & Canby Chartered, Rockville, MD, on the brief), for Appellee.

Panel: DEBORAH S. EYLER, MATRICCIANI and JAMES A. KENNEY, III, (Retired, Specially Assigned), JJ.

KENNEY, J.

Appellant, Gregory Pringle, appeals the order of the Circuit Court for Montgomery County affirming the adoption of Resolutions 10–156 (Preliminary Plan Amendment) and 10–157 (Site Plan) by the Montgomery County Planning Board ("the Planning Board"), which relate to a development project known as "The Shops at Seneca Meadows."[1] Mr. Pringle presents one question for our review:

> Whether substantial evidence supported the [Planning] Board's finding that its approval of the resolutions complied with the Sector Plan, despite the lack of active store fronts with multiple entrances and smaller retail uses facing Seneca Meadows Parkway and Observation Drive[?]

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are not in dispute. On September 22, 2009, the Montgomery County Council approved the "Germantown Employment Area Sector Plan" ("the Sector Plan"), which the Maryland–National Capital Park and Planning Commission ("the Planning Commission") adopted on October 15, 2009.[2] The Sector Plan is "a comprehensive amendment to the approved and adopted 1989 Germantown Master Plan" that "establishes a vision that will transform Germantown's central employment corridor into a vibrant town center and mixed-use uptown districts." Under the "areawide recommendations" of the Sector Plan, which apply to the "roughly 2,400–acre area in the employment and Town Center areas of

---

1. Both appellees—Minkoff Development Corporation and the Planning Board—have filed briefs in this case.

2. According to the Land Use Article of the Maryland Code, the Planning Board consists of Montgomery County's five members on the Planning Commission.

Germantown," are several "principles" which "[t]he design guidelines to implement this Sector Plan and all development must address." [3]

The Sector Plan's recommendations for the "Seneca Meadows/Milestone District"—a 390–acre area bordered by Ridge Road/MD 27 to the north, Germantown Road/MD 118 to the south, I–270 to the west, and North Frederick Road/MD 355 to the east and includes the area at issue in this case—state: (1) "Concentrate a limited amount of street level retail near the transit station. Big box retailers,[4] if proposed, *should* have active storefronts with multiple entrances and small retail uses facing Seneca Meadows Parkway and Observation Drive"; [5] and (2) "Street level retail *must* conform to the plan's urban design guidance." (Emphasis added).

---

**3.** In regard to "Street–Oriented Development," the design guidelines provide:

> Locate buildings adjacent to the street to form a building line of the sidewalk and street that form public spaces. Provide front entrances along the street to improve pedestrian convenience, activate the street, and reduce walking distances. Provide street level retail uses along streets where street activity is desired. Place retail, restaurants, and other uses at highly visible locations along boulevards and main streets to add vitality and convenience. Design retail storefronts with large, clear glass windows for merchandise display that promote retailing and add visual interest to the street.

**4.** The terms "big-box retailer" or "big-box store" are not defined in the Montgomery County Code or the Maryland Code. Big-box stores are, generally speaking, "predominantly one-room, single-story building of at least 35,000 square feet that housed a single retailer or grocer and that is surrounded by a large parking lot." Sarah Schindler, *The Future of Abandoned Big Box Stores*, 83 U. Colo. L.Rev. 471, 474 n. 5 (2012). "Examples that meet this definition include Wal–Mart, Target, Costco, Best Buy, Home Depot, Lowe's, Babies 'R' Us, Kmart, Kroger, and Safeway." *Id.* There is no dispute that Wegman's, the proposed retailer in this case, is a big-box retailer.

**5.** Observation Drive, which runs north/south, bisects the District and intersects Ridge Road to the north and Germantown Road to the south. Seneca Meadows Parkway, which also intersects Germantown Road to the south, follows the same general route of Observation Drive, which lies to its east, but instead of intersecting Ridge Road to the north, sharply veers east and intersects Observation Drive. The transit station lies on Seneca Meadows Parkway, *directly to the west of the intersection of Seneca Meadows Parkway and Observation Drive.*

On May 18, 2010, the Montgomery County Council approved Sectional Map Amendment G–887, which implemented the zoning recommendations contained in the Sector Plan. More specifically, the Sectional Map Amendment rezoned land located in the Seneca Meadows/Milestone District from an I–3 zone (Technology and Business Park zone) to a TMX–2 zone (Transit Mixed Use zone).[6] The Montgomery County Zoning Ordinance (§ 59–C–14.213 of the Montgomery County Code) states that "[d]evelopment under the TMX zone must be consistent with the recommendations of the applicable master or sector plan." (Emphasis added).[7]

On June 30, 2010, Seneca Meadows Corporate Center VII, LLP filed an application for approval of Site Plan No. 820100140. On July 16, 2010, Minkoff Development Corporation filed an application for approval of Preliminary Plan Amendment 11998004A.[8] As described by the Planning Board, the Site Plan was for the

> construction of a 150,000 SF grocery store,[9] 28,570 SF of general office, 4,300 SF of professional office, and 56,570 SF of retail/ restaurant uses ... on 21.0 acres in the TMX–2 zoned land, located in the northwest quadrant of the intersection of Seneca Meadows Parkway and Observation Drive ... within the [Sector Plan],

and the purpose of the Preliminary Plan Amendment was to

> create two lots (Lots 11 and 12) and two recorded parcels for future dedication (Parcels K and L) approximately 21 acres, 4.4 acres, 1 acre, and 1.9 acres, respectively, in the

----

**6.** The Circuit Court for Montgomery County affirmed the County Council's approval of the Sectional Map Amendment, see No. 332829–V, and that case is currently pending before this Court.

**7.** Section 59–C–14.211 states that all references to the TMX zone apply to the TMX–2 zone.

**8.** Because Minkoff describes itself, in its brief, as the applicant for both the Preliminary Plan Amendment and the Site Plan, we shall do so as well.

**9.** As noted, the grocery store is identified elsewhere in the record as a Wegman's grocery store.

TMX–2 Zone; located in the southwest quadrant of the intersection of Seneca Meadows Parkway and Observation Drive . . . within the [Sector Plan].

According to Mr. Pringle, the two applications "are related and dependent on one another since [the] preliminary plan creates lots at the site while [the] site plan identifies the types of buildings on these lots." On October 24, 2010, the Montgomery County Planning Department ("the Planning Department") recommended approval by the Planning Board of both applications, subject to certain conditions.[10]

On November 2, 2010, Mr. Pringle submitted written comments urging "the [Planning] Board to disapprove the Preliminary Plan Amendment and Site Plan for the Seneca Meadows property" because they are not "in conformance" with the Sector Plan. More specifically, he asserted that:

● "This big-box 'destination' shopping center proposed by the Site Plan directly contradicts the basic purpose and goals of the Sector Plan";

● "The Site Plan undermines the Sector Plan's vision for a transit-oriented community centered around the future [transit] station at Seneca Meadows";

● "The Site Plan's proposed parking design violates the Sector Plan";

● "The concentration of retail proposed in this Site Plan does not conform to the Sector Plan's vision for Germantown";

● "The design for the big box store proposed by this Site Plan contradicts the Sector Plan requirements for street-frontage"; and

---

**10.** The Planning Department "brings regulatory cases, master plans, functional plans and many other initiatives to the Montgomery County Planning Board. . . . Planning Department staff provides recommendations, information, analysis and services to the Montgomery County Planning Board, the County Council, the County Executive, other government agencies and the general public." Montgomery County Planning, Department, http://www.montgomeryplanning.org/department/ (last visited June 4, 2013).

- "The Site Plan includes a stormwater management design that contradicts the Sector Plan."

On November 4, 2010, following a hearing on the proposed Site Plan and Preliminary Plan Amendment, the Planning Board approved both applications, subject to certain conditions. The Planning Board issued, on December 22, 2010, Resolution 10–157 approving the Site Plan and Resolution 10–156 approving the Preliminary Plan Amendment. Resolution 10–157 states that the Site Plan is "consistent" with the Sector Plan. As to the Sector Plan's language that "[b]ig box retailers, if proposed, should have active storefronts with multiple entrances and small retail uses facing Seneca Meadows Parkway and Observation Drive," the resolution states:

The proposed retail is a few blocks east of the proposed transit station. The Planning Board finds that the location on the Subject Property is consistent with the Sector Plan's recommendation for retail "near the transit station." The Planning Board applied the Sector Plan's recommendation for "Big Box retailers" to the Wegman's grocery store. It is important to understand that the land use recommendations in master plans do not, and cannot specify all development possibilities, particularly a commitment to a particular design detail until the physical limitations of a site are understood. There are many site specific reasons why locating the retail uses on Seneca Meadows Parkway and Observation Drive was not feasible for this Property. First, development of this site under the new Environmental Site Design features of the new Stormwater Management Regulations requires the Applicant to essentially use every green area to take in water. This site drains naturally to the intersection of Seneca Meadows Parkway and Observation Drive. One of the low points for this site happens to be at the corner of Seneca Meadows Parkway and Observation Drive where the Sector Plan has called for retail frontage. Second, the grades at that intersection make it difficult to front buildings there, and in order to accommodate the topographical limitations of the site, these buildings have been fronted on an interior street.

The orientation of buildings and layout of the internal street network were heavily considered in this Application. The Applicant did front retail buildings on Seneca Meadows Parkway and Observation Drive consistent with the Sector Plan's recommendations where the topography is flat enough. The Applicant sited two buildings as an entrance to the development on Observation Drive that act as a gateway into the site. Likewise a separate building has been fronted on Seneca Meadows Parkway at the opposite entrance point to the site. For the rest of the development, the Applicant ultimately established a primary internal main street with smaller blocks that are pedestrian oriented as envisioned by the Sector Plan. Views and pedestrian relationships along each frontage street have been designed to begin the transformation of this environment to the urban form recommended in the Sector Plan. Due to constraints of the Subject Property, the Planning Board finds that the retail's frontage on an internal network of streets relatively near the proposed transit station is consistent with the Sector Plan.

As to the Sector Plan's recommendation that "[s]treet level retail must conform to the plan's urban design guidance," the resolution states, in pertinent part:

The Sector Plan also calls for street level retail to conform to its design guidance. The urban design recommendations of the Sector Plan include the call for street-oriented development, public amenities including plazas and gathering places, and the creation of vibrant pedestrian spaces. The application consists of a street network of smaller internal streets that will fulfill the Sector Plan's recommendation for urban form better than fronting retail along Seneca Meadows Parkway and Observation Drive at this location. Grading, drainage, and existing conditions do not currently promote the location of retails fronts on Seneca Meadows Parkway and Observation Drive. Future development phases that will occur to the west of the Subject Property will be better able to utilize Seneca Meadows Parkway itself for street activation. However, locating

retail on Observation Drive and Seneca Meadows Parkway at this point in the development in this area will not likely translate into viable retail.

Resolution 10–156 states that "the Preliminary Plan substantially conforms to the Master Plan." As to the Sector Plan's recommendations regarding big-box retailers and "urban design guidance," Resolution 10–156 includes statements nearly identical to those in Resolution 10–157.

Mr. Pringle petitioned for judicial review in the Circuit Court for Montgomery County. After a hearing, and reasoning that the Planning Board "had before it substantial evidence to conclude that the respective applications before it for preliminary plans and site plan approval were consistent with the recommendations contained in the [Sector Plan] and that the . . . [Planning] Board made specific findings of fact," the court affirmed the Planning Board's approval of both resolutions.

## DISCUSSION

Mr. Pringle, citing the language of the Montgomery County Zoning Ordinance that "[d]evelopment under the TMX zone *must be consistent* with the recommendations of the applicable master or sector plan," characterizes the Sector Plan recommendations as "binding" on the Shops at Seneca Meadows development plan and, therefore, the Planning Board's "legal conclusion that it has latitude in applying the requirements of the Sector Plan to the resolutions is not entitled to deference. . . ." (Emphasis added). On that premise, he argues on appeal:

> The record lacks substantial evidence to support the [Planning] Board's decision that the resolutions conformed to the Sector Plan's requirement that the Shops at Seneca Meadows have active store fronts with multiple entrances and smaller retail uses facing Seneca Meadows Parkway and Observation Drive.

According to Mr. Pringle, "the resolutions cite to evidence that acknowledges the development's shortcoming in meeting this requirement" of the Sector Plan. More specifically, he points

to the resolutions' recognition that some store fronts and smaller retail uses do not face Seneca Meadows Parkway and Observation Drive (*e.g.,* "[t]he application consists of a street network of smaller internal streets that will fulfill the Sector Plan's recommendation for urban form better than fronting retail along Seneca Meadows Parkway and Observation Drive at this location."). In sum, he contends that the Planning Board's actions "constitute[ ] legal error and the Court should reverse the [Planning] Board's approval of the resolutions."

As to the Sector Plan's recommendation regarding big-box retailers, the Planning Board responds that "the Sector Plan states that a development with a big box retailer **should** have these things, not must," which "is far from the strict mandatory requirement that [Mr. Pringle] asserts the recommendation requires." But, even if the recommendation is mandatory, "there is substantial evidence in the record to support the Planning Board's finding of consistency with this recommendation." Minkoff responds that "[t]here was substantial evidence of record to support the ... [Planning] Board's findings" and that "there was obvious planning logic behind the [Planning] Board's rationale."

In reviewing the decision of an administrative agency, our role " 'is essentially to repeat the task of the circuit court; that is, to be certain that the circuit court did not err in its review.' Thus, we review the decision of the administrative agency, not the decision of the circuit court." *Cinque v. Montgomery County Planning Bd.,* 173 Md.App. 349, 359, 918 A.2d 1254 (2007) (citations omitted). We will review that decision to ascertain: (1) whether there is an "error of law," and (2) whether "substantial evidence supports [the] factual findings...." *Long Green Valley Ass'n v. Prigel Family Creamery,* 206 Md.App. 264, 274, 47 A.3d 1087 (2012) (citation omitted).

As to legal conclusions, appellate courts
owe less deference ... to "the legal conclusions of the administrative body and may reverse those decisions where the legal conclusions reached by that body are based on an erroneous interpretation or application of zoning statutes,

regulations, and ordinances relevant and applicable to the property that is the subject of the dispute."

*Maryland–National Capital Park & Planning Comm'n v. Greater Baden–Aquasco Citizens Ass'n,* 412 Md. 73, 84, 985 A.2d 1160 (2009) (citation omitted). As to factual findings,

> [i]n applying the test for substantial evidence, the reviewing court "decides whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." The reviewing court defers to the agency's factual findings, if supported by the record. The reviewing court, moreover, "must review the agency's decision in the light most favorable to it; ... the agency's decision is prima facie correct and presumed valid, and ... it is the agency's province to resolve conflicting evidence and to draw inferences from that evidence."

*Employees' Ret. Sys. of Balt. v. Dorsey,* 430 Md. 100, 110, 59 A.3d 990 (2013) (internal citations omitted).

Finally, where appropriate,

> the reviewing Court must examine how the agency applied the law to the facts. This of course is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "Whether, ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]."

*Gray v. Anne Arundel Cnty.,* 73 Md.App. 301, 308–09, 533 A.2d 1325 (1987) (alterations in *Gray* ) (citation omitted). Here, we must determine, as a matter of law, how closely the development must hew to the Sector Plan recommendation stating that "[b]ig box retailers, if proposed, *should* have active storefronts with multiple entrances and small retail uses facing Seneca Meadows Parkway and Observation Drive," and then determine whether there is substantial evidence to support the agency's decision that the development is consistent with the Sector Plan. (Emphasis added). This is, as we see it, a mixed question of law and fact.

■ We have said:

A plan may serve as a mere guide or it may have greater effect. In most cases, planning documents have been referred to as general guides and recommendations advisory and not regulatory, in nature.... On the other hand, the Court of Appeals has found statutory language giving plans greater effect, in the context of regulating subdivision development. The Court of Appeals has held that a plan had binding effect and could serve as a basis for a planning board to refuse to approve a proposed subdivision when it was not compatible with the plan.

*Archers Glen Partners, Inc. v. Garner,* 176 Md.App. 292, 312–13, 933 A.2d 405 (2007) (internal citation omitted). Where, as here, "the local government has enacted a statute, ordinance, or regulation that links planning and zoning, 'the status of comprehensive plans [is elevated] to the level of true regulatory device.'" *Greater Baden–Aquasco Citizens Ass'n,* 412 Md. at 101, 985 A.2d 1160 (quoting *Mayor and Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514, 530, 814 A.2d 469 (2002)).

■ We agree with Mr. Pringle's assertion that the Sector Plan is "binding" on the Seneca Meadows development in the sense that the proposed development "must be consistent" with the Sector Plan recommendations. But we are persuaded that the recommendation in the Sector Plan on which Mr. Pringle specifically relies ("Big box retailers, if proposed, *should* have active storefronts with multiple entrances and small retail uses facing Seneca Meadows Parkway and Observation Drive.") is clearly aspirational rather than mandatory.[11]

Courts in Maryland and other jurisdictions addressing the regulatory effect of the word "should" have reached the same conclusion. This Court quite recently addressed the issue in

---

11. We note, in contrast, that at least one other recommendation of the Sector Plan states: "Street level retail *must* conform to the Plan's urban design guidance." (Emphasis added). Mr. Pringle does not argue in his appeal that the resolutions do not meet this requirement.

*Miller v. City of Annapolis Historic Pres. Comm'n,* 200 Md.App. 612, 28 A.3d 147 (2011). In that case, a design manual guideline indicated that materials to be used " 'to replicate historic elements such as contemporary synthetic fiberglass moldings, trim, and columns *should* be avoided.' " *Id.* at 619, 28 A.3d 147 (emphasis added). In rejecting the Millers' argument that the "the Commission had improperly banned the use of fiberglass," the Court stated that the "guidelines direct that contemporary materials 'should' be avoided. They do not provide that the materials 'shall' be avoided." *Id.* at 638–39, 28 A.3d 147.

In reaching that conclusion, the Court found

the analysis in *Caudill v. Judicial Ethics Comm.,* 986 S.W.2d 435, 438 (Ky.1998) (Stephens, C.J., concurring), instructive:

In comparing the definitions of should versus shall, it becomes evident that their meanings, while similar, are indeed distinct. Should is used to express duty, obligation, necessity, propriety, or expediency. Webster's Third New International Dictionary 2104 (3rd ed. unabridged 1993). Shall is used to express a command or exhortation. Webster's Third New International Dictionary at 2085. *Should, while definitely strongly encouraging a particular course of action,* is permissive. Shall requires a particular course of action and accordingly, is mandatory.

*Accord Perez v. State,* 420 Md. 57, 63 [21 A.3d 1048] (2011) (" 'When the Legislature commands that something be done, using words such as "shall" or "must" rather than "may" or "should," the obligation to comply with the statute or rule is mandatory.' ") (quoting *State v. Green,* 367 Md. 61, 82 [785 A.2d 1275] (2001)).[12]

*Id.* at 639–40, 28 A.3d 147 (emphasis added by Miller).

And, in interpreting a faculty handbook which allegedly obligated a university to promote a professor if certain criteria

---

12. In *Perez,* the Court of Appeals was interpreting the use of the word "shall" in Maryland Rule 4–326(d). In *Green,* the Court was interpret-

were met, the United States District Court for the Southern District of Indiana observed:

> Although the word "should" is the preterite tense of "shall," it does not express the same imperative or mandatory meaning as "shall." Indeed, although the word "should" ordinarily implies "duty or obligation," it is usually no more than an obligation of propriety or expediency, and it "does not ordinarily express certainty as 'will' sometimes does."

*Colburn v. Trustees of Indiana University,* 739 F.Supp. 1268, 1294 (S.D.Ind.1990) (quoting Black's Law Dictionary (5th ed.1979)). Other cases have also interpreted the word "should" as indicating a mere recommendation. *See McKinley v. Arkansas Dep't of Human Services, Div. of Family Services,* 311 Ark. 382, 389, 844 S.W.2d 366 (1993) ("The use of the word 'should' indicates that" a procedure is "recommended but not required for substantial compliance."); *Univ. of S. Fla. v. Tucker,* 374 So.2d 16, 17 (Fla.Ct.App.1979) ("Use of the word 'should' indicates" that a procedure "is discretionary rather than mandatory in nature."); *Conrad v. Conrad's Ex'r,* 123 Va. 711, 720, 97 S.E. 336 (1918) ("The use of the word 'should' indicates that it was a mere suggestion[.]").

To be sure, the Sector Plan strongly encourages "active storefronts with multiple entrances and small retail uses facing Seneca Meadows Parkway and Observation Drive." Therefore, the burden of justifying a deviation from the recommendation fell upon the Planning Board.

With that in mind, we are persuaded that there is substantial evidence in the record to support the Planning Board's findings of fact regarding the characteristics of the site itself and its ultimate conclusion of consistency with the Sector Plan. Specifically, in its Site Plan approval, the Planning Board found that the natural drain location of the site (at the corner of Seneca Meadows Parkway and Observation Drive where the Sector Plan has called for retail frontage) and the grades

---

ing the use of the word "shall" in what is now § 14–101(d)(1) of the Criminal Law Article.

of that intersection made "locating the retail uses on Seneca Meadows Parkway and Observation Drive ... not feasible," and that, due to those "constraints," "an internal network of streets relatively near the proposed transit station is [still] consistent with the Sector Plan."

Mr. Pringle offers a simple solution to the perceived problem—reject approval of a big-box retailer at this location. We are not persuaded that plan consistency would necessarily require rejecting a big-box retailer at a site that would otherwise permit it simply because site-specific restraints made the Plan recommendations not feasible at a particular location. In finding that the application was consistent with the Sector Plan, the Planning Board concluded that "this Application will transition the Seneca Meadows/Milestone District towards implementing the Sector Plan's vision. Later phases will build on this development...."

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**